IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| MICHELLE LANE, et al., | ) | Case No. 1:11-CV-00503-GBL-TRJ |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF |
| v. | ) | PLAINTIFFS' MOTION FOR PRELIMINARY |
| | ) | INJUNCTION |
| ERIC HOLDER, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**COME NOW** the Plaintiffs, Michelle Lane, Matthew Welling, Amanda Welling, and the

Second Amendment Foundation, Inc., by and through undersigned counsel, and submit their

Memorandum of Points and Authorities in Support of their Motion for Preliminary Injunction.

Dated: June 20, 2011             Respectfully submitted,

                                 Alan Gura (Va. Bar No. 68842)
                                 GURA & POSSESSKY, PLLC
                                 101 N. Columbus Street, Suite 405
                                 Alexandria, VA 22314
                                 703.835.9085/Fax 703.997.7665


                          By: /s/ Alan Gura_____
                                 Alan Gura
                                 Attorney for Plaintiffs

# TABLE OF CONTENTS

Table of Authorities......................................................... ii

Preliminary Statement........................................................ 1

Statement of Facts........................................................... 2

    *The Interstate Handgun Transfer Prohibitions* ................................ 2

    1.   *Federal Law*....................................................... 2

    2.   *Virginia Law*...................................................... 4

    3.   *District of Columbia Law*........................................... 4

    *Plaintiffs' Frustrated Efforts to Obtain Handguns*............................. 7

Summary of Argument......................................................... 9

Argument.................................................................. 11

    I.    THE BALANCE OF HARMS TIPS DECIDEDLY IN
          PLAINTIFFS' FAVOR............................................. 12

    II.   PLAINTIFFS WILL PREVAIL ON THE MERITS...................... 13

        A.   The Constitution Secures Access to Handguns..................... 13

        B.   The Interstate Handgun Transfer Prohibitions Are Subject to
            Strict Scrutiny............................................... 14

        C.   The Interstate Handgun Transfer Prohibitions Violate
            Plaintiffs' Rights............................................. 16

    III.  A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST...... 19

CONCLUSION............................................................... 20

TABLE OF AUTHORITIES

Cases

*Annex Books, Inc.* v. *City of Indianapolis*,
    581 F.3d 460 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Ashcroft* v. *ACLU*,
    542 U.S. 656 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Blackwelder Furniture Co.* v. *Seilig Mfg. Co.*,
    550 F.2d 189 (4th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Carey* v. *Pop. Servs. Int'l*,
    431 U.S. 678 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14, 16-18

*Cent. Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n*,
    447 U.S. 557 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Chesapeake B & M* v. *Harford County*,
    58 F.3d 1005 (4th Cir. 1995) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Citizens United* v. *FEC*,
    130 S. Ct. 876 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Clark* v. *Jeter*,
    486 U.S. 456 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Direx Israel, Ltd.* v. *Breakthrough Medical Corp.*,
    952 F.2d 802 (4th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12, 13

*Doe* v. *Bolton*,
    410 U.S. 179 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Elrod* v. *Burns*,
    427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Griswold* v. *Connecticut*,
    381 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Henry* v. *Greenville Airport Com.*,
    284 F.2d 631 (4th Cir. 1960) (per curiam). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*McDonald* v. *City of Chicago*,
    130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13, 14

*Newsom v. Albemarle County Sch. Bd.*,
    354 F.3d 249 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Nordyke* v. *King*,
    2011 U.S. App. LEXIS 8906 (9th Cir. May 2, 1996). . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Parker* v. *District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Patsone* v. *Pennsylvania*,
    232 U.S. 138 (1914). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Reliable Consultants, Inc.* v. *Earle*,
    517 F.3d 738 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Richmond Newspapers* v. *Virginia*,
    448 U.S. 555 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ross* v. *Meese*,
    818 F.2d 1132 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Schad* v. *Mt. Ephraim*,
    452 U.S. 61 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Schneider* v. *State*,
    308 U.S. 147 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United States* v. *Chester*,
    628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

*United States* v. *Engstrum*,
    609 F. Supp. 2d 1227 (D. Utah 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States* v. *Marzzarella*,
    614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States* v. *Masciandaro*,

638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Virginia* v. *Am. Booksellers Ass'n*,
    484 U.S. 383 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Williams* v. *Morgan*,
    478 F.3d 1316 (11th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14


Statutes, Rules and Regulations

18 U.S.C. § 921(a)(2).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 922(a) (5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 922(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 922(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 6

27 CFR § 478.96(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 12

27 CFR § 478.99 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

D.C. Code § 22-4505. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2502.06(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2505.01. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

D.C.M.R. 24-2320. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

D.C.M.R. 24-2320.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C.M.R. 24-2320.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C.M.R. 24-2320.3(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C.M.R. 24-2399. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. Civ. Proc. 65(a)(2).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 20

Va. Code § 18.2-308.2:2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Va. Code § 18.2-308(B) (10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Va. Code § 18.2-308(B)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Va. Code § 18.2-308(P1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Other Authorities

http://www.vsp.state.va.us/Firearms_Reciprocity.shtm (last visited June 18, 2011). . . . . . . . . 4, 7

http://www.washingtonpost.com/local/districts-only-firearms-
        dealer-to- move/2011/04/29/AFvAGHHF_story.html
        (last visited June 20, 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

THE WRITINGS OF THOMAS JEFFERSON
        (T.J. Randolph, ed., 1830). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

PRELIMINARY STATEMENT

This is a fairly simple case, seeking to bring handgun acquisition requirements into basic compliance with the Supreme Court's decisions in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008) and *McDonald* v. *City of Chicago*, 130 S. Ct. 3020 (2010). Federal, Virginia, and District of Columbia laws bar the transfer of handguns to non-state residents. Yet for decades, the acquisition of constitutionally-protected articles has been held immune from arbitrary distribution restrictions. *See, e.g. Carey* v. *Pop. Servs. Int'l*, 431 U.S. 678 (1977). Now that the possession of handguns is understood to be within the Second Amendment's protection, the interstate handgun transfer prohibitions must fall as well.

The relief sought by Plaintiffs is exceedingly narrow. Plaintiffs are *not* asking to be excused from compliance with background checks or local gun control schemes. Plaintiffs only seek to have handgun sales be subject to the same restrictions already in place for rifles and shotguns. There is no rational reason, let alone a constitutional one, for treating handguns differently from other firearms—a point specifically held in *Heller*. Yet the interstate handgun transfer bans are so onerous that they have reimposed the very evil the Supreme Court enjoined three years ago—Washington, D.C. residents are again forbidden from acquiring handguns.

Under the interstate handgun transfer ban, Washington, D.C. residents wishing to acquire handguns are required to arrange the shipment of those handguns from federally-licensed dealers in the various states, including Virginia, to an "in-state" District of Columbia firearms dealer. They must then visit the D.C. dealer twice—first to have him sign a piece of paper and collect an extravagant fee for his "service," and again, upon police approval, to retrieve the handguns they

had shipped to him from a state. The arrangement is ordinarily unconstitutional even when it works, but now, with the loss of the District's only government-certified middleman, no avenue remains available for District residents, including Plaintiffs Michelle Lane, Amanda Welling, and Matthew Welling, to lawfully take home a handgun.

The problems posed by the ban on interstate handgun sales may be most acutely felt in a tiny "state," where a variety of unique circumstances have combined to eliminate all retail gun stores. But the same issues confront all Americans, posing challenges well beyond those currently facing District residents. The basic bargain of our national union is that Americans, wherever they live, may travel freely across state borders and engage in otherwise lawful commerce without regard to their state of residence. This case is not merely about the practical reimposition of the D.C. handgun ban. That turn of events is only a most severe symptom of the basic constitutional injury at issue—the fact that in the market for a constitutionally-protected article necessary for basic self-defense, Americans face restrictions that could never be accepted in almost any other context. Injunctive relief is warranted.

STATEMENT OF FACTS

*The Interstate Handgun Transfer Prohibitions*

1.      *Federal Law*

Title 18 U.S.C. §§ 922(a)(3) and (5) forbid individuals from transporting into or receiving in their state of residence any firearm acquired outside that state since December 16, 1968, except for firearms acquired by bequest or intestate succession, or pursuant to a transfer from a federally-licensed dealer that complies with 18 U.S.C. § 922(b)(3). For purposes of these provisions, the District of Columbia is a "state." 18 U.S.C. § 921(a)(2).

2

Title 18, U.S.C. § 922(b)(3) and 27 CFR § 478.99 bar a licensed federal firearms dealer from transferring firearms to individuals who do not reside within the state in which the dealer's place of business is located. A significant exception to this prohibition allows a dealer to transfer rifles and shotguns to individuals residing out-of-state as long as the transaction would be legal "in both such states," that is, the purchaser's state, and the dealer's state. 18 U.S.C. § 922(b)(3). An interstate rifle or shotgun transaction is lawful if it complies with the requirements of 27 CFR § 478.96(c). 27 CFR § 478.99(a).

Pursuant to 27 CFR § 478.96(c)(1), interstate rifle or shotgun transactions are lawful provided:

(i)     The purchaser meets with the licensee in person at the licensee's premises to accomplish the transfer, sale, and delivery of the rifle or shotgun;

(ii)    The licensed importer, licensed manufacturer, or licensed dealer complies with the provisions of § 478.102; [requiring a background check]

(iii)   The purchaser furnishes to the licensed importer, licensed manufacturer, or licensed dealer the firearms transaction record, Form 4473, required by § 478.124; and

(iv)    The sale, delivery, and receipt of the rifle or shotgun fully comply with the legal conditions of sale in both such States.

"For purposes of [27 CFR § 478.96(c)], any licensed manufacturer, licensed importer, or licensed dealer is presumed, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both such States." 27 CFR § 478.96(c)(2).

By operation of these provisions, individuals who want to acquire handguns at retail, or from individuals in other states, may only take delivery of such handguns from a federal firearms

3

licensee in the state wherein they reside. But individuals may purchase rifles and shotguns freely across state lines provided they do so in person, comply with local laws, fill out standard federal forms, and undergo a background check.

2. *Virginia Law*

Va. Code § 18.2-308.2:2 bars a firearms dealer from transferring handguns, but not rifles or shotguns, to individuals who do not reside in Virginia. However, Virginia law does not prohibit out-of-state individuals from carrying or possessing handguns in Virginia. No law bars the otherwise-lawful open-carrying of handguns in Virginia by non-residents. Virginia allows individuals to transport concealed handguns without regard to residence. Va. Code §§ 18.2-308(B)(5), (10). Virginia also licenses the concealed carrying of handguns for self-defense by non-residents, Va. Code § 18.2-308(P1), and honors permits to carry concealed handguns issued by numerous states. *See* http://www.vsp.state.va.us/Firearms_Reciprocity.shtm (last visited June 18, 2011).

In other words, Virginia will allow a non-resident to do just about anything with a handgun that its own residents might do, except take delivery of one.

3. *District of Columbia Law*

The District of Columbia requires that all firearms be registered, but does not prohibit the importation of firearms. It requires only that "[a]n application for a registration certificate shall be filed (and a registration certificate issued) prior to taking possession of a firearm from a licensed dealer or [other registrant],"[1] and "[i]n all other cases, an application for registration shall be filed immediately after a firearm is brought into the District" within 48 hours of

---

[1]District law forbids individual-to-individual firearms transfers. D.C. Code § 7-2505.01.

4

providing notice to the police department. D.C. Code § 7-2502.06(a). Accordingly, firearms

dealers outside the District of Columbia can (and do) transfer rifles and shotguns to District

residents, once said residents return to the dealer with an approved registration certificate.[2]

A different rule prevails in the District of Columbia for handguns. Although District law

specifically allows a handgun buyer to transport handguns "from the place of purchase to his or

her home," D.C. Code § 22-4505, a Municipal Regulation entitled, "Procedures and

Requirements for Registration of a Pistol for the Purpose of Self-Defense Within Applicant's

Home," provides additional, superceding restrictions. D.C.M.R. 24-2320.1. A handgun

registration applicant must "[p]resent the Firearm Registration application to a licensed firearm

dealer, whose assistance is necessary to complete the application." D.C.M.R. 24-2320.3(b). A

"licensed firearm dealer" for purposes of this provision is a dealer licensed by the District of

Columbia. D.C.M.R. 24-2399.

Having obtained the signature of an in-District dealer on the application form, the

prospective handgun purchaser must take the form back to the District's police station for

approval. Once the handgun consumer obtains the required police seal on the handgun

registration application, the consumer must

> [p]resent the sealed Firearm Registration application to the licensed firearms dealer and
> take delivery of the applicant's pistol pending completion of a ballistic identification
> procedure, *or, in the case of a purchase from a firearms dealer located in another
> jurisdiction, have that firearms dealer transport the applicant's pistol to a licensed
> firearms dealer in the District, where the applicant will take delivery of the pistol*
> pending completion of a ballistic identification procedure.

D.C.M.R. 24-2320.3(f) (emphasis added).

---

[2]Pursuant to D.C. Code § 7-2502.06(a), individuals relocating to the District of Columbia
may bring with them the firearms they acquired as residents of other states.

Accordingly, to obtain a handgun in the District of Columbia, an individual must: (1) pick up a registration application form from the police; (2) shop for a handgun outside the District (no retail gun stores exist in the District); (3) "have that [out-of-District] dealer transport" the handgun to an in-District licensee; (4) meet the in-District licensee to complete the initial paperwork; (5) return the paperwork to the police and await approval; (6) return to the in-District licensee to take the handgun; and (7) return to the police with the handgun for ballistics testing. Buying a handgun thus requires three trips to the police station, two trips to the in-District licensee, one trip to an out-of-District gun store, the costs in time and money of all this travel, the costs of shipping the gun to the in-District licensee, as well as that licensee's additional fee—and all this, exclusive of the registration and other fees charged by the District for owning a gun.[3]

Until recently, only one federal firearms licensee, Charles Sykes, was in the business of effectuating lawful handgun transfers to District of Columbia residents. Sykes charged a fee of $125 per handgun transfer. Lane Decl., ¶ 4. Mr. Sykes has recently lost his lease in the District of Columbia and accordingly, as of this writing, is barred from effecting handgun transfers for District of Columbia residents. Lane Decl., ¶ 5. As a result, by operation of 18 U.S.C. § 922(b)(3), 27 CFR § 478.99, and D.C.M.R. 24-2320, District of Columbia residents are unable to lawfully acquire handguns other than by inheritance.

---

[3]The relief sought by Plaintiffs would modify these procedures only by eliminating the requirement that gun shoppers and dealers in Virginia ship firearms to a D.C. middleman, and leave the transferring process in Virginia, where it would otherwise naturally take place. D.C.'s gun registration scheme is not otherwise implicated by this lawsuit.

*Plaintiffs' Frustrated Efforts to Obtain Handguns*

Plaintiffs Michelle Lane, Amanda Welling, and Matthew Welling reside in the District of Columbia. Lane Decl., ¶ 1; A. Welling Decl., ¶ 1; M. Welling, ¶ 1. Plaintiff Second Amendment Foundation, Inc. ("SAF"), is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including the District of Columbia and Virginia. The purposes of SAF include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control. Versnel Decl., ¶ 2. Many of SAF's members and supporters purchase handguns for traditional lawful purposes, including self-defense. Versnel Decl., ¶ 3.

Michelle Lane, Amanda Welling, and Matthew Welling are all over the age of 21, are not under indictment, have never been convicted of a felony or misdemeanor crime of domestic violence, are not fugitives from justice, are not unlawful users of or addicted to any controlled substance, have not been adjudicated mental defectives or committed to a mental institution, have not been discharged from the Armed Forces under dishonorable conditions, have never renounced their citizenship, and have never been the subject of a restraining order relating to a child or an intimate partner. Lane Decl., ¶ 2; A. Welling Decl., ¶ 2; M. Welling Decl., ¶ 2. Ms. Lane holds a valid Utah permit to carry a handgun, which is recognized in Virginia. Lane Decl., ¶ 2; http://www.vsp.state.va.us/Firearms_Reciprocity.shtm (last visited June 18, 2011).

On April 23, 2011, Ms. Lane ordered two handguns from a licensed federal firearms dealer in Lorton, Virginia: a Kahr K9 Elite, and Ruger LCR. Prior to purchasing these handguns, Ms. Lane verified with the District of Columbia's Metropolitan Police Department that both

7

handguns were legal for her to possess in the District of Columbia, as she intends to do. Lane

Decl., ¶ 3. However, Lane has been unable to take possession of the handguns, as the only federal

firearms licensee in the District of Columbia, Charles Sykes, lost his lease and with it, his ability

to transfer handguns to District residents. Lane Decl., ¶¶ 4, 5.[4] But for the interstate handgun

transfer prohibitions, Lane would take possession of the two handguns she had ordered directly

from the Lorton store. Lane Decl., ¶ 7. Lane would comply with all other federal, state, and

District firearms transfer laws, including the mandatory background check, and register her

handguns in full compliance with District of Columbia law. *Id.*

Several homes on the Capitol Hill block where Amanda and Matthew Welling reside with

their infant son have been burglarized in recent years. A. Welling Decl., ¶ 3; M. Welling Decl., ¶

3. The Wellings have experienced theft from their patio and car. *Id.* Concerned for their family's

safety, the Wellings want to have a handgun at home for self-defense. *Id.*

Amanda Welling's father, Texas resident David Slack, shares this concern. Slack wants

the Wellings to be able to defend themselves at home, and in order to help them exercise their

right of self-defense, he would transfer to Amanda Welling one of his handguns, a Glock 19.

Slack Decl., ¶ 2. The Wellings would accept the transfer of Slack's handgun, A. Welling Decl., ¶

3; M. Welling Decl., ¶ 3, which Amanda Welling has verified is legal for them to possess. A.

Welling, ¶ 3.  But for the interstate handgun transfer prohibitions, Slack would transfer the

handgun to Amanda Welling through a Virginia federal firearms licensee. Slack Decl., ¶ 3; A.

Welling Decl., ¶¶ 3, 5. Amanda Welling would comply with all other federal, state, and District

---

[4]The Bureau of Alcohol, Tobacco, Firearms and Explosives confirmed that Sykes is out of business. *See, e.g.* http://www.washingtonpost.com/local/districts-only-firearms-dealer-to-move/2011/04/29/AFvAGHHF_story.html (last visited June 20, 2011).

firearms transfer laws, including the mandatory background check, and register her handgun in full compliance with District of Columbia law. A. Welling Decl., ¶ 5.

Quite apart from their current inability to transfer handguns, Michelle Lane, Amanda Welling, and Matthew Welling would participate more frequently in the market for handguns but for the interstate handgun sales restrictions. Lane Decl., ¶ 7; A. Welling Decl., ¶ 5; M. Welling Decl., ¶ 5. Plaintiffs find it burdensome and expensive to make multiple trips between gun stores outside the District of Columbia, the police station, and Sykes's office (or any other location to which he would move) inside the District, just to purchase a handgun.  Lane Decl., ¶ 6; A. Welling Decl., ¶ 4; M. Welling Decl., ¶ 4. They also find it burdensome and expensive to pay the costs of transferring guns from the out-of-District stores to Charles Sykes, and then to pay Sykes's $125 transfer fee, just to buy a handgun. *Id.* As SAF's members and supporters, in Virginia, the District, and throughout the United States, participate in the market for handguns, they are also adversely impacted by the additional costs and loss of choice imposed by interstate handgun sales prohibitions. Versnel Decl., ¶ 4.

## SUMMARY OF ARGUMENT

The Second Amendment secures a fundamental individual right to keep and bear arms for traditional lawful purposes, including self-defense. Handguns, generally, are among the arms whose possession and use is secured by the Second Amendment.

At least in this circuit, laws burdening the core Second Amendment rights of law-abiding, responsible individuals are subject to strict scrutiny. Moreover, like many courts, the Fourth Circuit looks to established First Amendment frameworks to evaluate Second Amendment questions. And considering that the Second Amendment secures fundamental rights, laws

9

classifying individuals in their exercise of the right to keep and bear arms are subject to the most exacting of equal protection standards.

Accordingly, this is a comparatively simple Second Amendment case. The federal government has no legitimate interest in telling an individual that she may take home her handgun only if it passes through the hands of a monopolistic middleman within the borders of her city, while she could take possession of other firearms from licensed dealers anywhere else in the land. Virginia does not bar the possession or use of handguns by non-residents; indeed, it licenses the concealed carrying of handguns by non-residents and recognizes carry permits issued by numerous other states. The District of Columbia does not otherwise bar its residents from receiving firearms in other jurisdictions, provided that its registration laws are obeyed.

Whatever interest any government entity has in regulating the purchase of handguns can plainly be satisfied by simply imposing such regulations, without regard to where the transaction occurs—just as the law treats the acquisition of long guns. After all, the law already charges dealers with responsibility for complying with the local laws of *any* jurisdiction in which a long gun customer resides. And at least from a dealer perspective, apart from the interstate transfer ban, there is *no difference* in the District's law with respect to handguns or other firearms. If the purchaser passes federal requirements and presents a D.C. police-approved registration certificate, the firearm can be transferred. Granting Plaintiffs all the relief they seek, they would *still* undergo all background checks, and comply with all federal, state, and local gun control regulations imposed by both Virginia and the District of Columbia. There is nothing to be gained by forcing Plaintiffs to perform an expensive and burdensome ritual through a "home state" intermediary.

On the other hand, the burdens imposed by interstate sales restrictions on individuals

seeking to purchase handguns are severe. Selection and competition are greatly reduced, while

the most basic transactions are burdened by monopolistic gouging, additional transfers, and

multiple additional visits to fill out paperwork. Considering Plaintiffs are entitled to exercise

their constitutional rights where they live, the interstate handgun transfer ban must be enjoined.

## ARGUMENT

Plaintiffs are entitled to preliminary injunctive relief upon satisfaction of a four-prong

test, measuring: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction

is denied; (2) the likelihood of harm to the defendant if the request is granted; (3) the likelihood

that the plaintiff will succeed on the merits; and (4) the public interest.  *Blackwelder Furniture

Co.* v. *Seilig Mfg. Co.*, 550 F.2d 189, 195-97 (4th Cir. 1977).

When the balance of harms "tips decidedly in favor of the plaintiff, a preliminary

injunction will be granted if the plaintiff has raised questions going to the merits so serious,

substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more

deliberate investigation." *Direx Israel, Ltd.* v. *Breakthrough Medical Corp.*, 952 F.2d 802, 813

(4th Cir. 1992) (citations and internal quotation marks omitted). "[I]t is enough that grave or

serious questions are presented; and plaintiff need not show a likelihood of success."

*Blackwelder*, 550 F.2d at 196.  The test is easily satisfied here.

Indeed, under Fed. R. Civ. Proc. 65(a)(2), on a hearing for a preliminary injunction

motion, "the court may advance the trial on the merits and consolidate it with the hearing." That

may well be the appropriate course of action here, as there are no factual disputes and the case

involves a pure question of law.

11

I.      THE BALANCE OF HARMS TIPS DECIDEDLY IN PLAINTIFFS' FAVOR.

The interest in self-defense is the "*central component* of the [Second Amendment] right itself," *Heller*, 554 U.S. at 599 (emphasis original). Plainly, the inability to access constitutionally-protected arms profoundly impacts one's sense of security—to say nothing of the irreparable harm resulting from a successful criminal attack that could have been averted with access to a firearm. There is simply no way to quantify, in terms of money damages, the inability to shoot back at a home invader.

"[T]he denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction." *Ross* v. *Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) (citation omitted). "The District Court has no discretion to deny relief by preliminary injunction to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right." *Henry* v. *Greenville Airport Com.*, 284 F.2d 631, 633 (4th Cir. 1960) (per curiam); *cf. Elrod* v. *Burns*, 427 U.S. 347, 373 (1976) (citation omitted). No constitutional right is so directly linked to one's immediate physical well-being as is the right to keep and bear arms.

Balanced against the harm to Plaintiffs from being denied the means of self-defense, Defendants would suffer no harm were an injunction issued. The relief sought by Plaintiffs does not excuse their compliance with any other gun laws. And permissible interstate firearm transfers already charge dealers with the duty to comply with all local laws. 27 C.F.R. § 478.96(c)(2).

Accordingly, the primary inquiry should concern whether Plaintiffs have established "grave or serious questions" about the constitutionality of the challenged provisions. *Blackwelder*, 550 F.2d at 196. Plainly, they have.

12

II.    PLAINTIFFS WILL PREVAIL ON THE MERITS.

    A.    The Constitution Secures Access to Handguns.

There is no question that the Second Amendment secures a right to possess functional

firearms, including handguns, in the home for self-defense. *Heller*, *supra*, 554 U.S. 570;

*McDonald*, *supra*, 130 S. Ct. 3020; *see also Patsone* v. *Pennsylvania*, 232 U.S. 138, 143 (1914)

("pistols . . . may be supposed to be needed occasionally for self-defence.").

The D.C. Circuit dismissed as "frivolous" the notion that handguns can be restricted

merely because other firearms are available. *Parker* v. *District of Columbia*, 478 F.3d 370,  400

(D.C. Cir. 2007), *aff'd sub nom Heller*. "It could be similarly contended that all firearms may be

banned so long as sabers were permitted. Once it is determined – as we have done – that

handguns are 'Arms' referred to in the Second Amendment, it is not open to the District to ban

them." *Id.* (citation omitted).

The Supreme Court agreed:

> It is no answer to say . . . that it is permissible to ban the possession of handguns so long
> as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we
> have observed, that the American people have considered the handgun to be the
> quintessential self-defense weapon.

*Heller*, 554 U.S. at 629. The Supreme Court then provided a list of reasons why a handgun might

be more suitable for home self-defense than a long arm, and concluded, "[w]hatever the

reason, handguns are the most popular weapon chosen by Americans for self-defense in the

home, and a complete prohibition of their use is invalid." *Id.*

Because there is a right to possess handguns, there is, necessarily, a right to acquire them.

The Second Amendment does not merely protect the right to possess the guns that someone

13

might manufacture from raw materials at home for private use (in any event, a highly-regulated

activity). "[C]ertain unarticulated rights are implicit in enumerated guarantees . . . fundamental

rights, even though not expressly guaranteed, have been recognized by the Court as indispensable

to the enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555,

579-80 (1980). A complete ban on gun commerce would violate the Second Amendment right at

its core. *United States* v. *Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). "Our citizens have

always been free to make, vend and export arms. It is the constant occupation and livelihood of

some of them." 3 THE WRITINGS OF THOMAS JEFFERSON 230 (T.J. Randolph, ed., 1830). The

government can no more ban the sale of protected guns than it can ban the sale of protected

books, *Virginia* v. *Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); contraceptives, *Carey*,

*supra*, 431 U.S. 678; *Griswold* v. *Connecticut*, 381 U.S. 479 (1965), or perhaps even the sale of

sex toys, *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738 (5th Cir. 2008); *but see Williams* v.

*Morgan*, 478 F.3d 1316 (11th Cir. 2007).

> B.      The Interstate Handgun Transfer Prohibitions Are Subject to Strict Scrutiny.

The Second Amendment secures a fundamental right. *McDonald*, 130 S. Ct. at 3042

(plurality opinion) & 3059 (Thomas, J., concurring). "[C]lassifications affecting fundamental

rights are given the most exacting scrutiny." *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (citation

omitted). Yet "as has been the experience under the First Amendment, we might expect that

courts will employ different types of scrutiny in assessing burdens on Second Amendment rights,

depending on the character of the Second Amendment question presented." *United States* v.

*Masciandaro,* 638 F.3d 458, __, 2010 U.S. App. LEXIS 5964 at *28 (4th Cir. 2011).

The Fourth Circuit has clearly instructed that strict scrutiny must be applied to test regulations implicating the core rights secured by the Second Amendment. In *United States* v. *Chester*, 628 F.3d 673 (4th Cir. 2010), the Fourth Circuit confronted a Second Amendment challenge to the federal firearms prohibition against domestic violence misdemeanants. "[W]e conclude that intermediate scrutiny is more appropriate than strict scrutiny for Chester and similarly situated persons," because "his claim is not within the core right identified in *Heller*—the right of a *law-abiding*, responsible citizen to possess and carry a weapon for self-defense." *Chester*, 628 F.3d at 683 (emphasis original); *cf. Cent. Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n*, 447 U.S. 557, 563 n.5 (1980) (an intermediate standard of review may apply to an enumerated right under circumstances where the right's exercise is "of less constitutional moment."). "As we observe that any law regulating the content of speech is subject to strict scrutiny, we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *Masciandaro*, 638 F.3d at __, 2010 U.S. App. LEXIS 5964 at *33 (citation omitted). "[W]e find the application of strict scrutiny important to protect the core right of the self-defense of a law-abiding citizen in his home." *Id.*, at *34-35; *see also United States* v. *Engstrum*, 609 F. Supp. 2d 1227, 1331-32 (D. Utah 2009) (applying strict scrutiny in Second Amendment analysis).

Unlike Mr. Chester, Plaintiffs are plainly law-abiding, responsible citizens. And whatever the scope of the Second Amendment right in other contexts, the right to have a handgun at home for personal self-defense is within the core of the Second Amendment—and that right is plainly burdened by laws restricting handgun transfers.

15

C.        The Interstate Handgun Transfer Prohibitions Violate Plaintiffs' Rights.

Under strict scrutiny, the government carries the burden of proving the law "furthers a compelling interest and is narrowly tailored to achieve that interest," *Citizens United* v. *FEC*, 130 S. Ct. 876, 898 (2010) (citation omitted), a burden that cannot be met where less restrictive alternatives are available. *Ashcroft* v. *ACLU*, 542 U.S. 656, 666 (2004).

It is unclear what is so compelling about ensuring that handgun transfers go through a local middleman who does absolutely nothing that the initial federal firearms licensee does not do—other than generate the cost of additional shipping, and charge an exorbitant fee.  Federal law already charges gun dealers selling rifles and shotguns with adherence to the laws of other jurisdictions when selling firearms to out-of-state residents. If a federal licensee can follow an out-of-state rifle law, he or she can follow an out-of-state handgun law.

Indeed, at least here, the situation is made very simple by the fact of the District's stringent gun registration scheme. Firearms may only be released to purchasers once the District's Metropolitan Police Department has approved a registration application. If the District has satisfied itself that the purchaser may take control of the handgun and bring it home, what does it matter whether the federal firearms licensee is located inside or outside the District?

The fact that interstate rifle and shotgun transfers are permitted at once exposes the lack of any governmental interest, let alone a *compelling* one, and supplies the obvious less-restrictive alternative—the very alternative utilized in the sales of long guns.

Balanced against the at-best mysterious governmental interest in banning interstate handgun transfers is the heavy burden visited upon handgun purchasers. These types of restrictions are usually not tolerated with respect to the exercise of constitutional rights.  In *Carey*

16

v. *Population Services*, *supra*, 431 U.S. 678, the Supreme Court struck down a law barring all but licensed pharmacists from selling contraceptives, holding that

> the restriction of distribution channels to a small fraction of the total number of possible retail outlets renders contraceptive devices considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase, and lessens the possibility of price competition.

*Carey*, 431 U.S. at 689 (footnotes omitted); *cf. Doe* v. *Bolton*, 410 U.S. 179 (1973) (striking down requirement that abortions only be performed in hospitals).

The concept that distribution restrictions are unconstitutional is also familiar in the First Amendment—an area to which the Fourth Circuit looks in evaluating Second Amendment claims. "[W]e agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment." *Chester*, 628 F.3d at 682 (citations omitted). Notably, "[one] is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schad* v. *Mt. Ephraim*, 452 U.S. 61, 76-77 (1981)  (quoting *Schneider* v. *State*, 308 U.S. 147, 163 (1939)).

Moreover, courts implicitly understand that retail prohibitions on the sales of First-Amendment-protected articles burden constitutional rights *per se*, imposing upon the government a heavy duty to justify the restrictions. For example, because "laws requiring the closure of bookstores at night and on Sunday are likely to curtail sales, the public benefits of the restrictions must be established by evidence, and not just asserted." *Annex Books, Inc.* v. *City of Indianapolis*, 581 F.3d 460, 463 (7th Cir. 2010). The Fourth Circuit has suggested that it would not tolerate "an unreasonable restriction on the hours of operation" of adult businesses whose

17

wares are protected by the First Amendment. *Chesapeake B & M* v. *Harford County*, 58 F.3d 1005, 1013 (4th Cir. 1995) (en banc).

Clearly, as with the laws struck down in *Carey* and *Bolton*, limiting handgun transfers only to dealers in one's own state (or the District of Columbia) reduces access, selection, and price competition. The size of any one state's handgun market is tiny compared to what is available nationwide—and the District of Columbia's handgun market is non-existent. As in *Schad* and *Schneider*, the fact that handgun buyers may be required to travel elsewhere to effectuate their right does not excuse locality-based restrictions. And, as with the adult bookstores at issue in *Annex Books* and *Chesapeake B & M*, the restrictions here on handgun purchases are severe in the limitations imposed upon individuals wishing to exercise their constitutional rights.

Even courts that do not follow the Fourth Circuit's approach to the Second Amendment might have difficulty sustaining the interstate handgun sales ban, at least on these facts. Without specifying the exact level of heightened scrutiny, *Nordyke* v. *King*, 2011 U.S. App. LEXIS 8906 at *6 n.9 (9th Cir. May 2, 1996), the Ninth Circuit recently held that "regulations which substantially burden the right to keep and bear arms trigger heightened scrutiny under the Second Amendment." *Id.* at *6.[5] *Nordyke* involved a gun show promoter's challenge to a County ban on gun shows. Focusing on whether "the restriction leaves open sufficient alternative avenues for obtaining the good or service," *Nordyke*, 2011 U.S. App. LEXIS at *24, the Ninth Circuit held

---

[5]On June 13, 2011, the Ninth Circuit ordered the *Nordyke* Appellees to respond to a motion for re-hearing *en banc*. Considering the case's "long and tangled procedural history" since 1999, *Nordyke*, 2011 U.S. App. LEXIS at *6, it would not be surprising if the panel opinion were soon vacated.

18

that the complaint failed to state a Second Amendment claim because "[i]t does not assert that the Ordinance makes it materially more difficult to obtain firearms. Nor does it allege a shortage of places to purchase guns in or near Alameda County." *Id.*, at *27-28. Nonetheless, the case was remanded to allow Plaintiffs to plead additional facts. *Id.*, at *29-30.

Whatever its merits, *Nordyke* is inconsistent with the Fourth Circuit's approach, which evaluates a burden on an individual's Second Amendment rights under strict or intermediate scrutiny depending on the individual's law-abiding character. Yet even under *Nordyke*'s more deferential approach, Plaintiffs would clearly prevail. Whatever the impact of gun shows in Alameda County, the interstate handgun transfer bans plainly impose a substantial burden on access to handguns—especially here, where they entirely foreclose such access.

The Court could not hesitate to enjoin a law barring interstate commerce in books, contraceptives, or religious articles. A ban on interstate commerce in articles protected by the Second Amendment must be enjoined as well.

III.   A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.

"Surely, upholding constitutional rights serves the public interest." *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (citation omitted). While some people believe that handguns are a social evil, the Constitution reflects a different judgment. It is inherently in the public interest that individuals be able to access the means of preserving their lives and the lives of their loved ones against criminal attack.

19

CONCLUSION

*Heller* and *McDonald* do not signal the end of all gun regulations.

But they do signal the end of these most pointless, burdensome regulations.

Respectfully, Plaintiffs are entitled to a preliminary injunction at this time, and considering the nature of the case and the lack of a possible factual dispute, suggest the case can be concluded under Rule 65(a)(2).

Dated: June 20, 2011                    Respectfully submitted,

                                        Alan Gura (Va. Bar No. 68842)
                                        GURA & POSSESSKY, PLLC
                                        101 N. Columbus Street, Suite 405
                                        Alexandria, VA 22314
                                        703.835.9085/Fax 703.997.7665

                                        By: /s/ Alan Gura
                                            Alan Gura
                                            Attorney for Plaintiffs

20

CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of June, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

Anna Elizabeth Cross
U. S. Attorney Office
2100 Jamieson Avenue
Alexandria, VA 22314
anna.cross@usdoj.gov
Counsel for Eric Holder

Catherine Crooks Hill
Office of the Attorney General
900 E Main St
Richmond, VA 23219
cchill@oag.state.va.us
Counsel for W. Steven Flaherty

Thomas L. Koger
Office of the Attorney General for the
District of Columbia
Assistant Attorney General
Equity I Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Thomas.Koger@dc.gov
Counsel for District of Columbia

/s/ Alan Gura
Alan Gura
GURA & POSSESSKY, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665
alan@gurapossessky.com
Counsel for Plaintiffs