# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

MICHELLE LANE, *et al.*,                    )
                                            )
      Plaintiffs,                  )
                                            )
        v.                        )      Civil Action No. 1:11cv503 (GBL/TRJ)
                                            )
ERIC HOLDER, Attorney General of the        )
United States, *et al.*,                    )
                                            )
      Defendants.                  )
_____ )

## DEFENDANT ERIC HOLDER'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Respectfully submitted,

NEIL H. MacBRIDE
United States Attorney

LAUREN A. WETZLER
STEPHEN J. OBERMEIER
Assistant United States Attorneys
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3752/3785
Fax: (703) 299-3983
lauren.wetzler@usdoj.gov
stephen.obermeier@usdoj.gov

COUNSEL FOR THE ATTORNEY GENERAL

OF COUNSEL:
Melissa Anderson
Bureau of Alcohol, Tobacco, Firearms and Explosives
Office of Chief Counsel
99 New York Avenue, NE
Washington, D.C. 20226

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FACTUAL ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

PRELIMINARY INJUNCTION STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.     THE COURT IS WITHOUT JURISDICTION TO
          ENTER A PRELIMINARY INJUNCTION OR
          HEAR THIS CASE BECAUSE PLAINTIFFS LACK
          STANDING TO SUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    II.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED
          ON THE MERITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          A.    The Challenged Federal Laws Fall Outside
                the Second Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          B.    Even If Plaintiffs' Suit Implicates Their
                Second Amendment Rights, the Federal
                Laws Are Constitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

               1.    At Most This Court Should Apply
                     Intermediate Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

               2.    The Federal Laws Satisfy Intermediate
                     Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    III.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE
          IRREPARABLE HARM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    IV.   A PRELIMINARY INJUNCTION IS NOT IN THE
          PUBLIC INTEREST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

V.     THE BALANCE OF EQUITIES TIPS IN THE
GOVERNMENT'S FAVOR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

<u>CASES</u>

*Allen v. Wright*,
    468 U.S. 737 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 10

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Annex Books, Inc. v. City of Indianapolis*,
    581 F.3d 460 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Blackwelder Furniture Co. v. Seilig Mfg. Co.*,
    550 F.2d 189 (4th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Brown v. City of Pittsburgh*,
    586 F.3d 263 (3d. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Carey v. Population Servs. Int'l*,
    431 U.S. 678 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

*Chesapeake B&M v. Harford Cnty.*,
    58 F.3d 1005 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Citibank v. Citytrust & Cititrust Bancorp, Inc.*,
    756 F.2d 273 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Dearth v. Holder*,
    641 F.3d 499 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Del. & H. Ry. Co. v. United Transp. Union*,
    450 F.2d 603 (D.C. Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
    952 F.2d 802 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Dronenburg v. Zech,*
    741 F.2d 1388 (D.C. Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Employment Div., Dep't of Human Res. of Oregon v. Smith,*
    494 U.S. 872 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Frank Krasner Enters., Ltd. v. Montgomery Cnty.,*
    401 F.3d 230 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Goss v. Lopez,*
    419 U.S. 565 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Griswold v. Connecticut,*
    381 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Henry v. Greenville Airport Comm'n,*
    284 F.2d 631 (4th Cir. 1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Hodgkins v. Holder,*
    677 F. Supp. 2d 202 (D.D.C. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Hohe v. Casey,*
    868 F.2d 69 (3d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Microsoft Corp. Antitrust Litig.,*
    333 F.3d 517 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Ingraham v. Wright,*
    430 U.S. 651 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 10

*McDonald v. City of Chicago,*
    130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*McEachin v. McGuinnis,*
    357 F.3d 197 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Nordyke v. King,*
    No. 07–15763, 2011 WL 1632063 (9th Cir. May 2, 2011). . . . . . . . . . . . . . . . . . . . . 17

iv

*Nunn v. State*,
    1 Ga. 243 (1846). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Planned Parenthood of Southeastern Pa. v. Casey*,
    505 U.S. 833 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
    872 F.2d 75 (4th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Rapier v. Harris*,
    172 F.3d 999 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Real Truth About Obama, Inc. v. FEC*,
    575 F.3d 342 (4th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Reliable Consultants, Inc. v. Earle*,
    517 F.3d 738 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Richmond Newspapers v. Virginia, Inc.*,
    448 U.S. 555 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ross v. Meese*,
    818 F.2d 1132 (4th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Salt Inst. v. Thompson*,
    345 F. Supp. 2d 589 (E.D. Va. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*San Diego Cnty. Gun Rights Comm. v. Reno*,
    98 F.3d 1121 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Schad v. Borough of Mt. Ephraim*,
    452 U.S. 61 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Schneider v. New Jersey*,
    308 U.S. 147 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Tiffany v. Forbes Custom Boats, Inc.*,
    959 F.2d 232 (4th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Chafin*,
    No. 09-4098, 2011 WL 1395818 (4th Cir. Apr. 13, 2011). . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Chester*,
    628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Engstrum*,
    609 F. Supp. 2d 1227 (D. Utah 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 17, 18

*United States v. Masciandaro*,
    638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Nat'l Treasury Employees Union*,
    513 U.S. 454 (1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Perry*,
    479 F.3d 885 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Reese*,
    627 F.3d 792 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*United States v. Salerno*,
    481 U.S. 739 (1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Walker*,
    709 F. Supp. 2d 460 (E.D. Va. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Warth v. Seldin*,
    422 U.S. 490 (1975).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Wetzel v. Edwards*,
    635 F.2d 283 (4th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Winter v. Natural Res. Def. Council, Inc.*,
    129 S. Ct. 365 (2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Wynne v. Town of Great Falls*,
    376 F.3d 292 (4th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Young v. Am. Mini Theatres, Inc.*,
    427 U.S. 50 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

<u>CONSTITUTIONS</u>

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 13, 15

U.S. Const. amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

U.S. Const. amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

U.S. Const. art. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

U.S. Const. art. III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

<u>STATUTES</u>

18 U.S.C. § 922(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 922(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 29

18 U.S.C. § 922(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 29

18 U.S.C. § 922(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 922(a)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 922(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 922(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 922(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

18 U.S.C. § 922(g)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

18 U.S.C. § 922(k). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5-73-120 Ark. Code § (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

720 Ill. Comp. Stat. 5 / 24-3(A)(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Act of Dec. 25, 1837, 1837 Ga. Laws 90................................................... 13

Ala. Code 13A-11-72(b). ................................................................. 23

Cal. Penal Code § 12125. ................................................................. 23

ch. 28, 1784 N.Y. Laws at 628............................................................ 13

ch. XX, 1801 Mass. Acts at 507. ......................................................... 13

Iowa Code § 724.15...................................................................... 23

Md. Code Ann. § 5-123(a)................................................................ 25

Md. Code Ann. § 5-128(b)................................................................ 25

Md. Code Ann. § 5-132(c)................................................................ 25

Md. Code Ann. § 5-133(d)................................................................ 25

Md. Code Ann. § 5-203................................................................... 25

Md. Code Ann. § 5-204................................................................... 25

Md. Code Ann. § 5-205................................................................... 25

S.C. Code Ann. § 16-23-30(A)(2)......................................................... 23

Va. Code Ann. § 15.2-915.2. ............................................................. 26

Va. Code Ann. § 18.2-308................................................................ 25

Va. Code Ann. § 18.2-308.2:2............................................................. 2

Va. Code Ann. § 18.2-308.7. ............................................................. 25

Va. Code Ann. § 18.2-309................................................................ 26

Wash. Rev. Code § 9.41.090(1)(c)(5). .................................................... 23

RULES

Fed. R. Civ. P. 65(a)(2). ............................................................... 2, 6

REGULATIONS

27 C.F.R. § 478.96(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

27 C.F.R. § 478.96(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

27 C.F.R. § 478.99(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 7

D.C. Mun. Regs. tit. 24, § 2320.3(b) & (f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

LEGISLATIVE MATERIALS

H.R. Rep. No. 90-1577 (1968).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

S. Rep. No. 89-1866 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18, 24

S. Rep. No. 90-1097 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24

PERIODICAL MATERIALS

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 511-12 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

OTHER

Letter of Thomas Jefferson to George Hammond, May 15, 1793, *available at* http://www.gutenberg.org/files/16783/16783-h/16783-h.htm. . . . . . . . . . . . . . . . . . . . . . . . . 14

Defendant Eric Holder, Attorney General of the United States, respectfully submits this memorandum in opposition to Plaintiffs' Motion for Preliminary Injunction.

## INTRODUCTION

Claiming that the relief they seek is "exceedingly narrow," Plaintiffs ask this Court to substitute its own judgment for that of Congress by taking the extraordinary step of issuing a mandatory preliminary injunction prohibiting the Attorney General of the United States from enforcing a federal statute and regulation nationwide on the ground that they are unconstitutional under the Second Amendment.[1]  U.S. Const. amend II; Memorandum of Points & Authorities in Support of Plaintiffs' Motion for Preliminary Injunction ("Plaintiffs' Memorandum" or "Pl. Mem."), at 1 (Dkt. No. 17).  Plaintiffs seek this sweeping relief even though they lack standing to sue, even though the federal laws they challenge are the type of "laws imposing conditions and qualifications on the commercial sale of arms" that the Supreme Court has deemed "presumptively lawful" under the Second Amendment, *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008), and even though the laws would survive any level of scrutiny the Court applied, though nothing more than intermediate scrutiny would be appropriate. Plaintiffs also are not entitled to a preliminary injunction because they have not demonstrated any irreparable harm, and the public interest in ensuring that the states can effectively regulate crime arising out of handgun violence far outweighs Plaintiffs' speculative harm.  Moreover, the

---

[1] Although Plaintiffs purport to bring their claims "facially and as applied" against themselves, First Amended Complaint ("First Am. Compl."), §§ 26 & 28 (Dkt. No. 8), the only relief they seek is a wholesale prohibition on enforcement of the challenged laws, *see id.* ("Prayer for Relief"), at 10-11; *see generally* Motion for Preliminary Injunction (Dkt. No. 16).  They seek no alternative relief regarding enforcement of the laws as to them alone.  The Court should thus see this case for what it is: A pure facial attack on the Federal Laws.  *See United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 477-78 (1995) (contrasting a "facial challenge" with a "narrower remedy" that is "limited to the parties before the Court").

appropriate body to contend with the immediate problem facing D.C. residents—the D.C. Council—reportedly recognizes the issue and is working to solve it.[2]

The Court should thus deny the preliminary injunction, as well as Plaintiffs' hasty request for a permanent injunction pursuant to Federal Rule of Civil Procedure 65(a)(2).

## STATUTORY AND REGULATORY BACKGROUND

Congress, with the assistance of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), has enacted a vast, interconnected framework of federal firearm laws regulating the interstate firearm market. Plaintiffs' suit challenges the constitutionality of a federal statute and regulation within that framework, 18 U.S.C. § 922(b)(3) & 27 C.F.R. § 478.99(a) ("Federal Laws"), as well as a District of Columbia regulation D.C. Mun. Regs. tit. 24, § 2320.3(b) & (f), and a Virginia statute, Va. Code Ann. § 18.2-308.2:2.

The federal statute challenged here, 18 U.S.C. § 922(b)(3), makes it "unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver –

> (3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States), and (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes.

18 U.S.C. § 922(b)(3); *see also id.* § 922(b), unnumbered ¶ after (5) (authorizing the transfer of firearms to out-of-state licensees). This statute works in tandem with §§ 922(a)(1)-(5) to prohibit

---

[2] *See* "District may provide handgun transfers," http://www.washingtonpost.com/local/dc-politics/district-may-provide-handgun-transfers/2011/07/07/gIQAew7o2H_story.html (last visited July 8, 2011) (Exhibit ("Ex.") A).

the interstate transfer of firearms except through Federal Firearms Licensees ("FFLs"). The federal regulation challenged by Plaintiffs, 27 C.F.R. § 478.99(a), implements § 922(b)(3) and essentially mirrors the statute. *See* 27 C.F.R. § 478.99(a).

Congress enacted the Gun Control Act of 1968 ("GCA"), including § 922(b)(3), following a multi-year investigation of violent crime. Based on extensive committee hearings on this issue, the Senate concluded:

> Not only is mail order a means of circumventing State and local law, but the over-the-counter sale of firearms, primarily handguns, to persons who are not residents of the locale in which the dealer conducts his business, affords similar circumvention. This problem is most prevalent in . . . those States where stringent firearms regulations are in effect and the purchaser is not able to purchase a firearm in accord with the laws of his State. As a result, a would-be purchaser travels to a neighboring State with less stringent controls and purchases the firearm which is then misused in his residence State.
>
> .
>
> The lack of adequate Federal controls over this aspect of the commerce in firearms affords circumvention and violation of the laws of several of the States similar to the mail-order methods of purchase.

S. Rep. No. 89-1866, at 3 (1966). Thus, § 922(b)(3) aimed to "deal with the serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities." *Id.* at 19.

## FACTUAL ALLEGATIONS

Plaintiffs Michelle Lane, Amanda and Matthew Welling, and the Second Amendment Foundation ("SAF") bring this action against the Attorney General, D.C., and Virginia under the Second, Fifth, and Fourteenth Amendments.[3] U.S. Const. amends. II, V, & XIV. Ms. Lane, who already owns one handgun, alleges that she has ordered two more handguns from a Virginia gun

---

[3] This brief addresses only Plaintiffs' Second Amendment claims because Plaintiffs' Memorandum is silent as to their Fifth Amendment Equal Protection claim against the Attorney General. Plaintiffs apparently concede that they are not likely to succeed on the merits of that claim.

dealer.  First Am. Compl. ¶ 10; Lane Declaration. ¶ 3 ("Lane Decl.").  Plaintiffs Amanda and

Matthew Welling allege that they would like to receive a handgun from Ms. Welling's father in

Texas, David Slack.  First Am. Compl. ¶ 11; Welling Decls. ¶ 3.  Plaintiffs contend that "[o]wing

to the operation of [the Federal, D.C., and Virginia laws at issue], Ms. Lane cannot take

possession of the handguns from the Lorton, Virginia firearms dealer from whom she ordered the

handguns, and the Wellings cannot take possession of the handgun sent by Slack."  First. Am.

Compl. ¶ 17.  In order for Plaintiffs to do so, they allege, they "must arrange to transfer the

various handguns to a federal firearms licensee in the District of Columbia, who could, in turn,

transfer the handguns to Plaintiffs."  *Id.* They cannot presently do so, they allege, because "only

one federal firearms licensee, Charles Sykes, was in the business of effectuating lawful handgun

transfers to District of Columbia residents," and having recently lost his lease, Mr. Sykes can no

longer effectuate the transfers.[4]  *Id.* ¶¶ 18-19.  Ms. Lane and the Wellings further assert, *inter*

*alia*, that even if Mr. Sykes were still operating his business, they "find it burdensome and

expensive to pay the costs of transferring guns from an out-of-state federal firearms licensee to

Charles Sykes, and then to pay Sykes's $125 transfer fee, just to acquire a handgun."  Welling

Declarations ("Welling Decl.") ¶ 4; Lane Decl. ¶ 6.

### PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is always an "extraordinary remedy."  *Real Truth About Obama,*

*Inc. v. FEC*, 575 F.3d 342, 346-47 (4th Cir. 2009), *reissued on remand*, 607 F.3d 355 (4th Cir.

2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008)).  But it is

particularly extraordinary where, as here, plaintiffs seek not to have the court preserve the status

---

[4] In fact, Charles Sykes is not the only FFL in D.C.  There are two other individuals and one LLC, among other entities, that are D.C. FFLs licensed as gun dealers.  *See* Ex. B, Declaration of Patricia Power ("Power Decl.").

quo, but rather to issue a *mandatory* injunction that would radically alter an intricate regulatory scheme by striking down federal laws. *See In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003) (citation omitted) ("The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits."). The district court's authority to issue a mandatory injunction "should be sparingly exercised," particularly where, as here, "serious issues are before the court," *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980) (internal quotation marks omitted), and "the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits," *Tiffany v. Forbes Custom Boats, Inc.*, 959 F.2d 232, *6 (4th Cir. 1992) (unpublished table decision).[5]

Since the Supreme Court's decision in *Winter*, a party seeking a preliminary injunction must make a "clear showing" that: (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in her favor; and (4) a preliminary injunction is in the public interest. *Real Truth*, 575 F.3d at 346 (quoting *Winter,* 129 S. Ct. at 374). All four requirements must be met. *See id.*

Plaintiffs ask the Court to apply an abrogated preliminary injunction standard. *See* Pl. Mem. at 11 (citing *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 195-97 (4th Cir. 1977)). The Fourth Circuit has expressly recognized that *Blackwelder* is no longer good law. *See Real Truth*, 575 F.3d at 347 ("The *Blackwelder* balance-of-hardship test may no longer be applied in granting or denying preliminary injunctions in the Fourth Circuit . . . ."). In particular, the Fourth Circuit discredited the portions of *Blackwelder* that used to allow plaintiffs to obtain a

_____

[5] Granting preliminary injunctive relief would allow plaintiffs to immediately obtain the guns they seek from the Virginia gun dealers and Mr. Slack.

preliminary injunction even if they could not show a likelihood of success on the merits, as long as there were "'grave or serious questions'" presented. *See Real Truth*, 575 F.3d at 346-47 ("The *Winter* requirement that the plaintiff clearly demonstrate that it will *likely succeed* on the merits is far stricter than the *Blackwelder* requirement that the plaintiff demonstrate only a grave or serious *question* for litigation.") (emphasis original); *but see* Pl. Mem. at 11 & 12 (quoting *Blackwelder*, 550 F.2d at 196). The Fourth Circuit has also insisted that the public interest "must always be considered." *Id.* at 347.

Applying the correct standard, this Court should deny the preliminary injunction. Before considering that standard, however, the Court should find that Plaintiffs' lack of standing to sue deprives the Court of jurisdiction to adjudicate their motion and this case.[6]

## ARGUMENT

## I.    THE COURT IS WITHOUT JURISDICTION TO ENTER A PRELIMINARY INJUNCTION OR HEAR THIS CASE BECAUSE PLAINTIFFS LACK STANDING TO SUE.

The limitation on the power of the judiciary to hear only "cases" and "controversies" arises out of concerns over the separation of powers. U.S. Const. art. III; *Allen v. Wright*, 468 U.S. 737, 750 (1984). Such concerns are at the forefront of this lawsuit, as Plaintiffs ask the Court to invalidate and effectively rewrite a federal law that was enacted after extensive Congressional debate and that forms part of an intricate statutory scheme.

---

[6] Plaintiffs suggest that the Court may wish to "advance the trial on the merits and consolidate it with the hearing" on the preliminary injunction. Pl. Mem. at 11 (quoting Fed. R. Civ. P. 65(a)(2)). The Court should not do so. "[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). It would be particularly inappropriate in this case where the issues are so weighty and should not be decided in haste. Where a court does advance to the merits, it is required to give the parties ample notice of its intent to do so before any hearing. *See id.*

In order to have standing to sue under Article III, a plaintiff has the burden to establish

three elements: (1) injury; (2) causation (also known as "traceability"); and (3) redressability.

*See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). To establish the second

element, "the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and

not . . . th[e] result [of] the independent action of some third party not before the court." *Id.* at

560 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)) (alterations in

original). As the Supreme Court explained in *Lujan,* where "the plaintiff is not himself the

object of the government action or inaction he challenges, standing is not precluded, but it is

ordinarily 'substantially more difficult' to establish." *Id.* at 562 (quoting *Allen*, 422 U.S. at 758).

This is so because the element of causation "depends on the unfettered choices made by

independent actors not before the courts and whose exercise of broad and legitimate discretion

the courts cannot presume either to control or to predict." *Id.*

Plaintiffs in this case challenge Federal Laws that require FFLs to sell or otherwise

transfer firearms to individuals who reside in the same state or to FFLs in other states. *See* 18

U.S.C. § 922(b)(3) & 27 C.F.R. § 478.99. The laws thus expressly regulate the conduct of gun

*dealers*, and not the conduct of gun *buyers* like the Plaintiffs. Because Plaintiffs are not the

"object" of the Federal Laws, they face a heavy burden to show that their injury is fairly traceable

to those laws, rather than to the choices of third-party gun dealers. *Lujan*, 504 U.S. at 561-62.

The Supreme Court, the Fourth Circuit, and this Court have all found a lack of standing

in circumstances where the existence of a third-party not before the Court broke the chain of

causation. *See, e.g., Allen*, 468 U.S. at 759 (finding that African-American parents lacked

standing to allege that the IRS's failure to adopt sufficient standards governing the denial of tax-

exempt status to discriminatory private schools denied their children the ability to attend

desegregated public schools, as the causal chain depended on the decisions of third-party private schools and white parents); *Simon*, 426 U.S. at 42-43 (holding that indigent hospital patients lacked standing to challenge an IRS revenue ruling that they claimed encouraged hospitals to deny hospital services to indigent people because it was "purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications"); *Frank Krasner Enters., Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 235 (4th Cir. 2005) (denying standing to gun show promoter and exhibitor that challenged a county law denying public funding to venues that display and sell guns because a third-party stood "directly between the plaintiffs and the challenged conduct in a way that breaks the causal chain"); *Salt Inst. v. Thompson*, 345 F. Supp. 2d 589, 599-600 (E.D. Va. 2004) (holding that industry groups that sued the government over an alleged failure to disclose its data and methods in a study on salt could not establish that their injury was fairly traceable to the challenged conduct rather than "to some independent third party not before the Court").

In a case similar to this one, the Ninth Circuit held that the plaintiffs lacked standing to claim that the Crime Control Act purportedly caused the price of banned devices and grandfathered arms to increase, thus violating their constitutional rights. *See San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121 (9th Cir. 1996).[7] As the court explained:

> Another fatal flaw with plaintiffs' economic injury theory is that it is third-party weapon dealers and manufacturers - not the government defendants - who have raised the prices of assault weapons. . . . [N]othing in the Act directs manufacturers or

---

[7] Although the Ninth Circuit rejected the plaintiffs' Second Amendment claim on grounds that would not withstand *Heller*, *see San Diego Cnty. Gun Rights Comm.*, 98 F.3d at 1125 n.1, the standing analysis with respect to the plaintiffs' other constitutional claims is unaffected by *Heller*.

> dealers to raise the price of regulated weapons. Under *Lujan*, plaintiffs' injury does not satisfy the requirements of Article III because it is "th[e] result [of] the independent action of some third party not before the court." 504 U.S. at 560. . . .

*Id.* at 1130. The Court thus recognized that the independent decisions of gun dealers broke the chain of causation between the alleged injury and the challenged federal law.

The same is true here. Plaintiffs cannot maintain that the Federal Laws alone prevent them from obtaining weapons—the laws clearly do not ban handgun sales or transfers. Rather, Plaintiff Michelle Lane complains that she "has been unable to take possession of the handguns [from a dealer in Virginia], as the only federal firearms licensee in the District of Columbia, Charles Sykes, lost his lease and with it, his ability to transfer handguns to District residents." Pl. Mem. at 8; *see also* Lane Decl. ¶¶ 4-5. Sykes' absence from the market has also meant that Plaintiffs Amanda and Matthew Welling have allegedly been unable to receive the handgun that Ms. Welling's father would like to transfer to her. *See* Pl. Mem. at 8; Welling Decls. ¶ 3; 18 U.S.C. § 922(a)(3) (requiring plaintiffs to receive handguns in a manner consistent with § 922(b)(3)). Ms. Lane and the Wellings further allege that they "find it burdensome and expensive to pay the costs of transferring guns from an out-of-state federal firearms licensee to Charles Sykes, and then to pay Sykes's $125 transfer fee, just to acquire a handgun."[8] Welling Decls. ¶ 4; Lane Decl. ¶ 6. Although Plaintiffs fail to allege as much, the First Amended Complaint implies that there is no one in D.C. from whom Plaintiffs may directly buy firearms.

In fact, Charles Sykes is not the only FFL in D.C. *See* Ex. A, Power Decl. While it is

---

[8] The Attorney General need not address the alleged injury of Plaintiff SAF because whether SAF attempts to rest its standing on a purported injury to the organization itself or to its members, the declaration of Julianne Versnel is plainly insufficient to establish standing. *See Hodgkins v. Holder*, 677 F. Supp. 2d 202, 206 (D.D.C. 2010), *rev'd on other grounds sub nom. Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011) (rejecting comparable claims of injury by SAF in reliance on *Warth v. Seldin*, 422 U.S. 490, 511 (1975) – a holding that was not appealed).

unclear why Sykes and others are allegedly not transferring or selling firearms to D.C. residents at this time, any number of factors could play a role: the small population of D.C. may make transferring or selling guns to individuals an insufficiently lucrative business; stringent zoning laws in D.C. may make it difficult for licensed gun dealers to find locations to operate; the historical ban on handgun possession in D.C. before *Heller* may have led individuals to choose a different profession; or perhaps it is some combination of these and other factors that has left D.C. without a thriving market of commercial gun dealers. Regardless of which factors account for Sykes and others allegedly not transferring or selling guns at this time, what is clear is that the choices of "independent actors not before the courts[,] whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," are impeding Plaintiffs' ability to obtain a handgun either by purchasing one from a retail gun seller in D.C. or obtaining one through transfer from a D.C. FFL.[9] *Lujan*, 504 U.S. at 562. Because the decisions of third-party gun dealers break the chain of causation between the injury Plaintiffs allege and the

---

[9] Plaintiffs are likely to point to their allegations that "[b]ut for the interstate handgun transfer prohibitions, Lane would take possession of the two handguns she had ordered directly from the Lorton store" and that "[b]ut for the interstate handgun transfer prohibitions, Slack would transfer the handgun to Amanda Welling through a Virginia federal firearms licensee." Pl. Mem. at 8. But the Second Amendment does not give Plaintiffs a right to possess firearms *from Virginia* for self-defense. Their right, as identified in *Heller,* is to possess firearms for self-defense in the home, and Plaintiffs could do so consistent with the Federal Laws but for the actions of third-parties in D.C. that are not before the Court. *See United States v. Masciandaro*, 638 F.3d 458, 467 (4th Cir. 2011) ("The upshot of these landmark decisions [*Heller* and *McDonald*] is that there now exists a clearly-defined fundamental right to possess firearms for self-defense within the home."). Moreover, that Plaintiffs' Second Amendment injury might be *redressable* through the extraordinary step of enjoining the challenged Federal, D.C., and Virginia Laws does not demonstrate that the alleged injury is *fairly traceable* to the Federal Laws. *See Allen*, 468 U.S. at 753 n.19 (distinguishing between traceability, which focuses on "the causal connection between the assertedly unlawful conduct and the alleged injury," and redressability, which "examines the causal connection between the alleged injury and the judicial relief requested"). As the Supreme Court said in *Allen*, even if the injury might have been substantially diminished by the relief the plaintiffs in that case sought, it still would not have been traceable to the challenged conduct. *See id.*

challenged Federal Laws, the Court should hold that plaintiffs lack standing to sue and that the

Court lacks Article III jurisdiction to hear this case.

## II.  PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs' discussion of their "likelihood of success on the merits" fails even to

acknowledge the significant limitations the Supreme Court placed on its narrow holding in

*Heller*, that individuals have a Second Amendment right to possess firearms for self-defense in

the home.  The Court in *Heller* made clear that the Second Amendment right is "not unlimited,"

*Heller*, 554 U.S. at 595, and provided a non-exhaustive list of "presumptively lawful regulatory

measures":

> Although we do not undertake an exhaustive historical analysis today of the full
> scope of the Second Amendment, ***nothing in our opinion should be taken to cast
> doubt on*** longstanding prohibitions on the possession of firearms by felons and the
> mentally ill, or laws forbidding the carrying of firearms in sensitive places such as
> schools and government buildings, or ***laws imposing conditions and qualifications
> on the commercial sale of arms***.

*Id.* at 626-27 & n.26 (emphases added).  Two years later, in *McDonald v. City of Chicago*, 130 S.

Ct. 3020 (2010), the Court "reaffirmed that Second Amendment rights are far from absolute,

reiterating that *Heller* had 'assur[ed]' that many basic handgun regulations were presumptively

lawful."  *Masciandaro*, 638 F.3d at 467.[10]

In view of *Heller*'s discussion of such "presumptively lawful" regulations, 554 U.S. at

626-27 n.26, the Fourth Circuit has adopted a two-part approach for considering Second

Amendment challenges such as this one:

---

[10] While the inclusion of commercial firearms laws on the list of presumptively lawful
regulations may technically be dictum, "the Fourth Circuit  has held 'carefully considered
language of the Supreme Court, even if technically dictum, generally must be treated as
authoritative.'" *United States v. Walker*, 709 F. Supp. 2d 460, 465 (E.D. Va. 2010) (quoting
*Wynne v. Town of Great Falls*, 376 F.3d 292, 298 n.3 (4th Cir. 2004)) (upholding 18 U.S.C. §
922(g)(9) as presumptively lawful under *Heller*).

The first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. If it was not, then the challenged law is valid. If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny.

*United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (internal citations omitted). Thus, in assessing Plaintiffs' likelihood of success on the merits, this Court must first determine whether it is likely to find that the Federal Laws fall outside the scope of the Second Amendment. As "laws imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 526-27, that impose a *de minimis* burden on the rights of gun buyers generally, they do. Only if the Court were to find that the Federal Laws likely fall within the Second Amendment's scope would it have to consider the appropriate level of scrutiny to apply. Here, at most intermediate scrutiny is appropriate, which the Federal Laws clearly withstand.

### A.    The Challenged Federal Laws Fall Outside the Second Amendment.

The Federal Laws are precisely the type of "laws imposing conditions and qualifications on the commercial sale of arms" that the Supreme Court deemed "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26. As *Heller* suggests, such "presumptively lawful regulatory measures" may lie "outside the scope of the Second Amendment." *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010); *see, e.g.*, *Walker*, 709 F. Supp. 2d at 464-65 (finding 18 U.S.C. § 922(g)(9) constitutional solely on the basis that it fell within *Heller*'s list of presumptively lawful regulations). The Federal Laws lie outside the Second Amendment because they are restrictions on *gun dealers* that impose a *de minimis* burden on the Second Amendment rights of *gun buyers*.[11]

_____

[11] Because Plaintiffs bring a facial challenge to the Federal Laws, *see supra* n.1, they bear the heavy burden of proving that "no set of circumstances exists under which the Act would be

The question of whether a law falls outside the scope of the Second Amendment is a "historical inquiry [that] seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *Chester,* 628 F.3d at 680. The plainest indication of the meaning of the Second Amendment at the time of ratification lies in its text: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Rather than speaking to the sale of arms, the Second Amendment addresses the right of the gun buyer to "keep and bear Arms." *Id.* Yet the Federal Laws at issue do nothing more than place geographical conditions on where *gun dealers* may commercially *sell* or transfer arms.

Laws passed just before and after ratification confirm that the Second Amendment did not foreclose laws regulating the sale of weaponry. In 1784 and 1801, respectively, New York and Boston enacted regulations that placed burdens on how commercial sellers of gun powder—a necessary ingredient for the exercise of the Second Amendment right to bear arms—could transport their goods. *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 511-12 (2004) (citing ch. 28, 1784 N.Y. Laws at 628; ch. XX, 1801 Mass. Acts at 507). And, in the decades after ratification, Georgia enacted a statute that criminalized the possession *and sale* of certain weapons, including pistols. *See id.* at 514 (citing Act of Dec. 25, 1837, 1837 Ga. Laws 90);[12] *cf. United States v.*

_____

valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), that is, that there is *no state* across the whole country in which the burden on its residents of having to buy a handgun either from an in-state dealer or from out-of-state through an in-state dealer could be considered a *de minimis* burden. Even if the Court were considering an as applied challenge, which it is not, *see supra* n. 1, whatever burden D.C. residents face as a result of market conditions, it is not the Federal Laws that are creating that burden.

[12] Although the Supreme Court of Georgia struck down the law to the extent it criminalized carrying pistols openly, it upheld the law's constitutionality insofar as it

*Chafin*, No. 09-4098, 2011 WL 1395818, *2 (4th Cir. Apr. 13, 2011) (upholding another provision of the GCA that regulates the sale of firearms upon finding no authority "that remotely suggests that, at the time of its ratification, the Second Amendment was understood to protect an individual's right to *sell* a firearm. Indeed, although the Second Amendment protects an individual's right to bear arms, it does not necessarily give rise to a corresponding right to sell a firearm.").[13]

Unable to avoid the Federal Laws' focus on sellers rather than buyers, Plaintiffs rely on an inferred "right to acquire" handguns not explicitly recognized in *Heller.* Pl. Mem. at 13. Even assuming *arguendo* that such a right exists,[14] it is necessarily narrow, given the Court's pronouncement that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 526-27. The Federal Laws at issue, which merely require gun *dealers* to sell to others in their own state or transfer firearms to FFLs in other

---

criminalized the carrying of the weapons in a *concealed* fashion and said nothing to undermine the law's validity with respect to the *sale* of weapons. *See Nunn v. State*, 1 Ga. 243 (1846).

[13] Plaintiffs' quotation from then-Secretary of State Thomas Jefferson is not to the contrary. Pl. Mem. at 14. When read in context, the quotation plainly relates to whether it was appropriate to require gun sellers and manufacturers to cease their occupations all together during times of war. Letter of Thomas Jefferson to George Hammond, May 15, 1793, *available at* http://www.gutenberg.org/files/16783/16783-h/16783-h.htm ("Our citizens have been always been free to make, vend and export arms. It is the constant occupation and livelihood of some of them. To suppress their callings, the only means perhaps of their subsistence, because a war exists in foreign and distant countries, in which we have no concern, would scarcely be expected. . . . The law of nations, therefore, respecting the rights of those at peace, does not require from them such an internal derangement in their occupations."). It says nothing about whether geographical conditions may be placed on the sale of weapons consistent with the Second Amendment.

[14] Plaintiffs selectively quote from *Richmond Newspapers v. Virginia, Inc.*, 448 U.S. 555, 579-80 (1980), to suggest that the case supports inferring a "right to acquire" arms. Pl. Mem. at 13-14. The full quote states, "*Notwithstanding the appropriate caution against reading into the Constitution rights not explicitly defined*, the Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees." *Id.* at 579 (emphasis added). While the Supreme Court has sometimes recognized "unarticulated rights," lower courts have rightfully been reluctant to do so. *See, e.g., Dronenburg v. Zech*, 741 F.2d 1388, 1396 (D.C. Cir. 1984).

states, represent such a *de minimis* burden on the right of gun buyers across the country to "keep and bear," U.S. Const. amend. II, or "acquire," Pl. Mem. at 13, handguns that the Federal Laws would still fall outside the scope of even such an expanded Second Amendment right. *Cf. Ingraham v. Wright,* 430 U.S. 651, 674 (1977) ("There is, of course, a de minimis level of imposition with which the Constitution is not concerned."); *Goss v. Lopez,* 419 U.S. 565, 575-76 (1975) (recognizing that *de minimis* deprivations do not implicate Fifth Amendment due process concerns); *United States v. Perry*, 479 F.3d 885, 890 (D.C. Cir. 2007) (holding that the exclusion of defendant's son from the courtroom during trial was too trivial to implicate the defendant's Sixth Amendment rights); *McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir. 2004) (recognizing that some deprivations of the First Amendment right to free exercise are so minor that "this area of the law is no different from many others in which the time-honored maxim '*de minimis non curat lex'* applies"); *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) ("De minimis burdens upon the [First Amendment right to] free exercise of religion are not of constitutional dimension.").  In establishing modest state-based geographical conditions on where gun dealers may sell firearms, the Federal Laws clearly do not enact a "ban" on firearms. *Cf.*  Pl. Mem. at 14 (citing *Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977); *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008)).

In sum, because the Federal Laws are "presumptively lawful regulatory measures" that impose a *de minimis* burden on the Second Amendment, Plaintiffs' claims stand little likelihood of succeeding under the first part of the *Chester* inquiry.  *Heller*, 554 U.S. at 627 n.26.  Even if the Court were to advance to the second part, however, the claims would still fail.

**B.** **Even If Plaintiffs' Suit Implicates Their Second Amendment Rights, the Federal Laws Are Constitutional.**

Even assuming there is a minimal burden on Plaintiffs' ability to possess handguns caused by the Federal Laws—*i.e.*, having to purchase handguns in state or from an out-of-state dealer through an in-state FFL—and that the burden implicates Plaintiffs' Second Amendment rights, the Federal Laws are plainly constitutional. Such an insignificant burden at most warrants intermediate scrutiny, and the Federal Laws pass constitutional muster under that level of review.[15] For this additional reason, there exists here no likelihood of success on the merits.

### 1. At Most This Court Should Apply Intermediate Scrutiny.

"[A]s has been the experience under the First Amendment, we might expect that courts will employ different types of scrutiny in assessing burdens on Second Amendment rights, depending on the character of the Second Amendment question presented." *Masciandaro*, 638 F.3d at 470. In fact, in two recent decisions, the Fourth Circuit has applied intermediate scrutiny in analyzing federal laws under the Second Amendment. *See id.* at 471; *Chester*, 628 F.3d at 682-83. And since *Heller*, every federal court reviewing a federal firearm regulation except one[16] has applied something less than strict scrutiny. *See, e.g.*, *Marzzarella*, 614 F.3d at 97.

In determining the appropriate level of review, the Fourth Circuit in *Chester* and

---

[15]  The Federal Laws would also satisfy strict scrutiny for the reasons set forth below and because they are "presumptively lawful," *Heller*, 554 U.S. at 527 n.26, but nothing more than intermediate scrutiny is appropriate.

[16]  Although a single district court applied strict scrutiny to a federal law banning firearm possession by a domestic violence misdemeanant (and upheld the law under that level of scrutiny), *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1232 (D. Utah 2009), that decision likely is not good law on the question of the applicable level of scrutiny given the Tenth Circuit's later decision upholding a federal law barring possession of firearms while subject to a domestic protection order under intermediate scrutiny, *see United States v. Reese*, 627 F.3d 792, 802-04 (10th Cir. 2010).

*Masciandaro* found that a court must consider the extent to which a challenged law burdens a plaintiff's Second Amendment rights. The *Masciandaro* court explained that it must "take into account the nature of a person's Second Amendment interest, *the extent to which those interests are burdened by government regulation*, and the strength of the government's justifications for the regulation." 638 F.3d at 470 (emphasis added). Similarly, the *Chester* court explained:

> The Second Amendment is no more susceptible to a one-size-fits-all standard of review than any other constitutional right. . . . *[L]ess severe burdens on the right, laws that merely regulate rather than restrict*, and laws that do not implicate the central self-defense concern of the Second Amendment, *may be more easily justified*.

*Chester*, 628 F.3d at 682 (emphases added).

Other federal appellate courts have likewise focused on the extent of the burden to Second Amendment rights in determining the appropriate level of review. *See Marzzarella*, 614 F.3d at 97; *Nordyke v. King*, 2011 WL 1632063, *4-5 (9th Cir. May 2, 2011); *Reese*, 627 F.3d at 802. In *Marzzarella*, for example, the Third Circuit applied intermediate scrutiny in upholding a federal law prohibiting the possession of a handgun without a serial number. In so doing, the court explained that intermediate scrutiny was appropriate for two reasons. First, "[t]he burden imposed by the law d[id] not severely limit the possession of firearms." 614 F.3d at 97. That is,

> [t]he District of Columbia's handgun ban [in *Heller*] is an example of a law at the far end of the spectrum of infringement on protected Second Amendment rights . . . . It did not just regulate possession of handguns; it prohibited it, even for the stated fundamental interest protected by the right-the defense of hearth and home. But § 922(k) does not come close to this level of infringement. It leaves a person free to possess any otherwise lawful firearm he chooses—so long as it bears its original serial number.

*Id*. Second, unlike the District of Columbia's ban, "the legislative intent behind § 922(k) was not to limit the ability of persons to possess any class of firearms." *Id.* Accordingly, "[b]ecause § 922(k) was neither designed to nor has the effect of prohibiting the possession of any class of firearms," intermediate scrutiny was appropriate. *Id.*

While these cases do not involve the types of federal laws at issue here—*i.e.*, laws regulating the commercial transfer of arms—the courts' focus on the extent to which challenged laws burden Second Amendment rights indicates that at most, the Federal Laws should be subject to intermediate scrutiny. As explained *supra*, the Federal Laws impose no substantial burden on Plaintiffs' Second Amendment rights. That is, the Federal Laws, acting alone, do not *restrict* Plaintiffs from exercising their rights as law-abiding citizens to possess a handgun in their homes for self-defense. Rather, the laws put geographical conditions on where gun dealers may sell or transfer firearms. In other words, the Federal Laws do not regulate *whether* individuals can obtain handguns—they regulate who may sell them where. Thus, the laws upheld in *Chester* and *Masciandaro*—which were subject to intermediate scrutiny—were in many ways *more* restrictive than the Federal Laws at issue here in that they prohibited firearm possession by an entire class of persons and in certain locations outside the home.

Moreover, like the law at issue in *Marzzarella*, the Federal Laws were not intended to prevent the possession of handguns by law-abiding citizens for self-defense in the home. In enacting the GCA, Congress explained:

> These provisions will serve to give greatest assurance that State and local laws can be effectively enforced, without the necessity of encroaching unduly upon the longstanding rights and privileges of the millions of firearms owners, collectors, and users who put them to legal, wholesome, and beneficial use.

S. Rep. No. 89-1866, at 6 (1966). In other words, Congress sought to enable states to regulate handgun traffic within their borders, not to prohibit the possession of handguns.

Plaintiffs vastly over-read *Chester* and *Masciandaro* in arguing that those cases "clearly instructed" that strict scrutiny must be applied to a law simply because it implicates the core rights secured by the Second Amendment. Pl. Mem. at 15. As an initial matter, neither case involved

the regulation of the Second Amendment's core right of self defense in the home by a law-abiding citizen—the law in *Masciandaro* prohibited possession in certain areas outside the home, and the law in *Chester* prohibited possession by domestic violence misdemeanants. Thus, any discussion by those courts regarding the application of strict scrutiny is dicta. Moreover, while the court in *Masciandaro* did state in dicta that it would "*assume* that any law that would burden the 'fundamental,' core right" protected by the Second Amendment would be "subject to strict scrutiny," 638 F.3d at 470 (emphasis added), that statement must be taken in the context of the surrounding discussion. As explained *supra* at 16-17, the Fourth Circuit explicitly stated that in determining the appropriate level of scrutiny, it would consider "the extent to which [Second Amendment] interests are burdened by government regulations," and *Masciandaro* quoted *Chester* for the proposition that "less severe burdens on the right, laws that merely regulate rather than restrict . . . may be more easily justified." *Id.* Thus, the Fourth Circuit plainly did not suggest that *all* burdens on the fundamental right, no matter how incidental, require strict scrutiny.

Indeed, such a framework for analyzing Second Amendment cases would make little sense. Under the Plaintiffs' reading of *Chester* and *Masciandaro*, a law requiring that guns be sold in the rear of Wal-Mart stores away from the toy section, or a law requiring a nominal fee to process paperwork for a background check prior to purchase, would be subject to strict scrutiny simply because it imposes *some* burden on law-abiding citizens wishing to purchase handguns for self-defense in the home. But such an expansive application of strict scrutiny "would likely foreclose an extraordinary number of regulatory measures" and "handcuff[] lawmakers' ability" to impose reasonable restrictions on commercial arms transactions. *See id.* at 471. And considering that *Heller* indicated that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful," Plaintiffs' interpretation is particularly inappropriate. 554 U.S.

at 626-27 & n.26.  Indeed, the Supreme Court expressly stated that "[t]he Constitution leaves . . . a variety of tools for combating th[e] problem [of handgun violence], *including some measures regulating handguns*."  *Id.* at 636 (citing *id.* at 626-27 & n.26) (emphasis added).

Nor do the First Amendment and right to privacy cases cited by Plaintiff indicate that the burdens imposed by the Federal Laws are substantial enough to warrant strict scrutiny.  *See* Pl. Mem. at 16-18.  As an initial matter, the Court need only look to *Chester* and *Masciandaro* to decide this case.  *See supra* at 16-17.  But regardless, the cases cited by Plaintiffs do not support application of strict scrutiny here.  The right to privacy cases cited by Plaintiffs do not, as Plaintiffs suggest, stand for the proposition that all "distribution restrictions," Pl. Mem. at 17, on fundamental rights constitute substantial burdens.  *See, e.g.*, *Carey v. Population Servs.*, 431 U.S. 678, 686 (1977) ("The business of manufacturing and selling contraceptives may be regulated in ways that do not infringe protected individual choices."); *see also Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 873 (1992) ("As our jurisprudence relating to all liberties save perhaps abortion has recognized, not every law which makes a right more difficult to exercise is, *ipso facto*, an infringement of that right."); *cf. Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) ("Although the[] rights of voters are fundamental, not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates. . . . [T]he state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.").

And unlike the Federal Laws, the laws in Plaintiffs' First Amendment cases imposed absolute prohibitions.  *See Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76 (1981) ("Here, the Borough totally excludes all live entertainment, including nonobscene nude dancing that is otherwise protected by the First Amendment."); *Schneider v. New Jersey*, 308 U.S. 147, 165

(1939) (prohibiting distribution of pamphlets in streets and alleys); *see also Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 62 (1976) (upholding a zoning ordinance that "prohibit[ed] theaters which are not licensed as 'adult motion picture theaters' from exhibiting films which are protected by the First Amendment" because the burden imposed was minimal and did not effectuate a ban).[17]  Accordingly, these cases do not in any way suggest that intermediate scrutiny is inappropriate.[18]

## 2. The Federal Laws Satisfy Intermediate Scrutiny.

In *Chester*, the Fourth Circuit explained that to satisfy intermediate scrutiny, "the government must demonstrate . . . that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective."  628 F.3d at 683.  "[I]ntermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question." *Masciandaro*, 638 F.3d at 474.  Applying intermediate scrutiny here, Plaintiffs cannot show a likelihood of success on the merits because the Federal Laws are plainly constitutional.

The Federal Laws advance at least a "substantial government objective."  The GCA

---

[17] The two additional First Amendment cases cited by Plaintiffs do not apply strict scrutiny.  *See Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 462 (7th Cir. 2010) (applying intermediate scrutiny); *Chesapeake B&M v. Harford Cnty.*, 58 F.3d 1005, 1010 (4th Cir. 1995) (applying "prior restraint analysis" to a law that risked "censorship and delay" by the government).

[18] Another First Amendment case, *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990) (Scalia, J.), also counsels against applying strict scrutiny here.  In that case, the Supreme Court held that "generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need not be justified by a compelling interest." *Id.* at 886 n.3; *see also Brown v. City of Pittsburgh*, 586 F.3d 263, 284 (3d. Cir. 2009).  Similarly, the Federal Laws, which generally regulate interstate firearm transfers and are neutral with respect to handgun possession, but allegedly have the effect of burdening handgun possession for a few individuals in the District of Columbia, should not be required to further a compelling government interest.

generally establishes a comprehensive framework for regulating the inter-state transfer of

handguns. Section 922(b)(3) specifically protects states' ability to enforce their own handgun

laws within their jurisdictions. That is, Congress enacted § 922(b)(3) "to prevent the avoidance of

State and local laws controlling firearms by the simple expediency of crossing a State line to

purchase one." H.R. Rep. No. 90-1577, at 9 (1968); S. Rep. No. 90-1097, at 86 (1968). This

decision was based on, *inter alia*, the following findings:

> (1) that the existing Federal controls over the traffic in firearms moving in . . . interstate or foreign commerce do not adequately enable the States to control the firearms traffic within their own borders through the exercise of their police power; . . .
>
> (3) that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the business of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible;
>
> (4) that the acquisition on a mail-order basis of firearms *other than rifles and shotguns* by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances[;]
>
> (5) that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to *nonresidents* of the State in which the licensee's place of business is located, has tended to make ineffective the laws, regulations and ordinances in the several States and local jurisdictions regarding such firearms.

S. Rep. No. 90-1097, at 80-81 (emphasis added); *see also id.* at 51 ("The provisions of th[is] title

which prohibit a licensee from disposing of firearms (other than rifles and shotguns) to persons

who are not residents of the State in which he conducts his business is justified by the record,

which is replete with testimony documenting the fact that the purchase of such firearms by

persons in other than their residence [sic] State is a serious contributing factor to crime.").

Nothing in *Heller* undermines these findings or otherwise renders the government's interest in

enabling states to enforce their handgun laws less substantial.

Even today, states continue to impose a wide range of handgun regulations that vary

substantially in their restrictiveness.[19]  The continued existence of a wide disparity among the state

handgun laws justifies the ongoing regulation of the interstate transfer of handguns.

Moreover, there plainly exists at least a "reasonable fit" between the Federal Laws and the

government's interest in protecting states' ability to enforce their own handgun laws within their

jurisdiction.  By preventing individuals from directly purchasing handguns out-of-state, the

Federal Laws ensure that individuals cannot evade their own state's handgun laws by, for

example, simply ordering a handgun online from a state with more lax regulations.  *Cf.* S. Rep.

No. 90-1097, at 50  ("The title would have the effect of channeling interstate and foreign

commerce in firearms other than rifles and shotguns through federally licensed importers,

manufacturers, and dealers, thereby prohibiting the commercial mail order traffic in firearms other

than rifles and shotguns to unlicensed persons.  This will enable the States to more effectively

control this traffic within their own jurisdictions [and protects against] . . . . circumvention and

contravention of State and local laws governing the acquisition of firearms.").  And requiring an

individual to obtain an out-of-state handgun from an in-state FFL assists in preventing unlawful

purchases by ensuring that dealers who are required to know and follow their state's handgun laws

will not make unauthorized sales.  This requirement also allows the states to monitor more

effectively the enforcement of state gun laws by focusing on dealer compliance.

---

[19] *Compare, e.g.*, Ala. Code 13A-11-72(b) (forbidding "habitual drunkard[s]" to possess pistols); 5-73-120 Ark. Code § (a) ("A person commits the offense of carrying a weapon if he or she possesses a handgun, knife, or club on or about his or her person, in a vehicle occupied by him or her, or otherwise readily available for use with a purpose to employ it as a weapon against a person."); Cal. Penal Code § 12125 (making it unlawful to manufacture, import, sell, or give an "unsafe handgun"); 720 Ill. Comp. Stat. 5 / 24-3(A)(g)  (imposing a longer waiting period following purchase for firearm that can be concealed); Iowa Code § 724.15 (requiring an individual must obtain an annual permit before acquiring ownership of any pistol or revolver); S.C. Code Ann. §16-23-30(A)(2) (making it unlawful to sell, deliver, exchange any pistol to any person who is a member of a subversive organization); Wash. Rev. Code § 9.41.090(1)(c)(5) (imposing a 5-day waiting period for pistols).

Plaintiffs contend that in light of *Heller*, the Court should rewrite the law such that handguns would be regulated in the same manner as rifles and shotguns. Pl. Mem. at 1. But under intermediate scrutiny, the federal government is not required to demonstrate that the Federal Laws constitute the least intrusive means of advancing its substantial interest in protecting states' abilities to enforce their handgun laws within their jurisdictions. *See Masciandaro*, 638 F.3d at 474. And in any event, granting Plaintiffs' request would in fact undermine the government's substantial interest in enabling states to regulate crime caused by handgun violence and substantially alter the scheme regulating the interstate transfer of firearms.

Congress has long recognized that handguns pose a substantially greater threat to public safety than do rifles and shotguns. Specifically, in enacting the GCA, Congress cited evidence that "overwhelmingly demonstrated that the handgun is the type of firearm that is principally used in the commission of serious crime." S. Rep. No. 89-1866, at 7; *see also* S. Rep. No. 90-1097, at 80-81 (finding that "the ease with which any person can acquire firearms *other than a rifle or shotgun* . . . is a significant factor in the prevalence of lawlessness and violent crime in the United States" and that "there is a causal relationship between the easy availability of firearms *other than rifles and shotguns*, and juvenile and youthful criminal behavior" (emphases added)). In contrast, Congress found that rifles and shotguns "are used substantially less frequently by the lawless" and "their preponderant use [is] in a lawful and beneficial manner." *Id.*

This correlation between handguns and violent crime is no less problematic in a post-*Heller* world. Empirical evidence shows that a staggering percentage of violent crime in the United States, and within the District of Columbia, is attributable to handguns.[20] Moreover, the

---

[20] Between 2000 and 2009, 490 law enforcement officers were feloniously killed by a firearm in the line of duty. Federal Bureau of Investigation, Uniform Crime Reports, http://www2.fbi.gov/ucr/killed/2009/data/table_27.html (last visited July 7, 2011). 72% of them

*Heller* Court itself recognized the connection between handguns and violent crime: "We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many amici who believe that prohibition of handgun ownership is a solution." 554 U.S. at 636. Congress thus has a strong public safety interest in regulating the interstate transfer of handguns. *See Masciandaro*, 638 F.3d at 473 (indicating that "cases have sometimes described the government's interest in public safety" as "compelling").

Moreover, in contrast to handguns, states do not heavily regulate long guns. For example, in Maryland, handguns but not rifles and shotguns are considered "regulated firearms" subject to extensive regulations, including, *e.g.*, Md. Code Ann. §§ 5-123(a) (7-day waiting period); § 5-128(b) (one gun per month restriction); § 5-132(c) (restrictions on sale/transfer without safety devices); § 5-133(d) (restrictions on possession by those under 21). In contrast, there appear to be a total of three Maryland laws regulating long guns. *See* Md. Code Ann. §§ 5-203 (a prohibition on possession of short barreled long guns); *id.* at § 5-204 (purchase of out of state long guns limited to adjacent states); *id.* at § 5-205 (allowing possession of a long gun by a person with a mental disorder if the person "possesses a physician's certificate that he person is capable of possessing a rifle or shotgun without undue danger to the person or to another"). Similarly, Virginia regulates handguns more extensively than long guns. *Compare* Va. Code Ann. §§ 18.2-308 (regulating the carrying of pistols and revolvers); *and* § 18.2-308.7 (prohibiting those

---

were killed using handguns. *Id.* The percentage of these deaths attributed to rifles and shotguns was only 19% and 7%, respectively. *Id.* The District of Columbia's handgun statistics similarly reveal the disproportionate threat that handguns pose to the public safety. In 2009, at least 70% of the people murdered by firearms in the District of Columbia were killed with handguns. *Id.* at http://www2.fbi.gov/ucr/cius2009/data/table_20.html (last visited July 7, 2011). Less than 2% of these same deaths are known to have resulted from shotguns and rifles, combined. *Id.* From 2005-2009, at least 73% of those killed by firearms across the country were killed by handguns. *Id.*, http://www2.fbi.gov/ucr/cius2009/offenses/expanded_information/data/shrtable_08.html (last visited July 7, 2011).

under 18 from possessing handguns); *and* 18.2-309 (making it unlawful to transfer a handgun to a minor) *with* Va. Code Ann. § 15.2-915.2 (making it unlawful to transport a loaded shotgun or rifle in any vehicle on a public street, road, highway unless a person "reasonably believes that a loaded rifle or shotgun is necessary for his personal safety in the course of his employment or business"). Thus, Plaintiffs' contention that 27 C.F.R. § 478.96(c)(1)-(2) could adequately regulate handgun transfers, *see* Pl. Mem. at 16, is without merit. Put simply, it would be unrealistic to "presume[]" that licensed dealers will know and uphold handgun laws from all fifty states, while such a presumption is perfectly reasonable with respect to state long gun laws. *See* 27 C.F.R. § 478.96(c)(2). Accordingly, requiring handguns purchased out of state to be transferred through an in-state FFL is critical to protecting adequately states' ability to enforce their own gun laws within their jurisdictions.

In sum, Plaintiffs have failed to demonstrate a likelihood of success on the merits. The Federal Laws do not implicate Plaintiffs' Second Amendment rights, and regardless, they would survive intermediate scrutiny. Thus, Plaintiffs' preliminary injunction request should be denied.

## III.  PLAINTIFFS HAVE FAILED TO DEMONSTRATE IRREPARABLE HARM.

A plaintiff requesting a preliminary injunction must "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." *Real Truth About Obama*, 575 F.3d at 347 (citing *Winter*, 129 S. Ct. at 374-76). Plaintiffs have made no such showing here.

Plaintiffs' alleged urgent need to immediately obtain handguns to protect themselves from criminal attack in their homes is both speculative and belied by their own actions. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (stating that "irreparable harm must be neither remote nor speculative, but actual and imminent") (internal quotations omitted). According to their Amended Complaint, Plaintiffs lost their ability to obtain

a handgun when Charles Sykes lost his lease in April 2011.  *See* First Am. Compl. ¶¶ 18-19.  But

Plaintiffs also apparently failed to obtain a handgun that could protect them in the approximately

*three years* between the 2008 *Heller* decision and the termination of Sykes's lease, and the

burdens allegedly imposed by the Federal Laws have been in place for far longer.  Additionally,

Plaintiffs did not move for a preliminary injunction until June 20, 2011, more than five weeks

after they filed their complaint.  Such a delay in requesting a preliminary injunction undermines

Plaintiffs' allegation of irreparable harm.  *See, e.g.*, *Quince Orchard Valley Citizens Ass'n v.*

*Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (quoting *Citibank v. Citytrust & Cititrust Bancorp, Inc.*,

756 F.2d 273, 276 (2d Cir. 1985) ("Although a particular period of delay may not rise to the level

of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of

irreparable harm required to support a preliminary injunction.")).

Moreover, Plaintiffs' mere allegation of a violation of their Second Amendment rights

does not result in irreparable harm per se.  "[I]n cases involving a claim by movant of interference

with protected freedoms or other constitutional rights, the finding of irreparable injury cannot

meaningfully be rested on a mere contention of a litigant."  *Del. & H. Ry. Co. v. United Transp.*

*Union*, 450 F.2d 603, 619 (D.C. Cir. 1971).  Rather, such a finding "depends on an appraisal of

the validity, or at least the probable validity, of the legal premise underlying the claim of right in

jeopardy of impairment."  *Id.* at 619-20; *see also Henry v. Greenville Airport Comm'n*, 284 F.2d

631, 633 (4th Cir. 1960) (per curiam)  ("The District Court has no discretion to deny relief by

preliminary injunction to a person who *clearly establishes by undisputed evidence* that he is being

denied a constitutional right.") (emphasis added); *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir.

1987) ("[T]he denial of a constitutional right, *if denial is established*, constitutes irreparable harm

for purposes of equitable jurisdiction." (emphasis added)).  As explained in detail in Section II,

*supra*, Plaintiffs have failed to establish—much less by "undisputed evidence," *see* Pl. Mem. at 12 (quoting *Henry*)—that the Federal Laws violate the Second Amendment.

But in any event, contrary to Plaintiffs' claims, "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 112-13 (1983)). In *Hohe*, the Third Circuit explained that while the deprivation of First Amendment rights typically constitutes irreparable harm, "the assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits." *Id.* at 72-73. "It is purposeful unconstitutional government suppression of speech which constitutes irreparable harm . . . ." *Id.* at 73 (alterations omitted); *see also id.* ("[I]t is the direct penalization, as opposed to incidental inhibition, of First Amendment rights which constitutes irreparable injury." (alterations omitted)).

In this case, there has been no purposeful suppression of Plaintiffs' Second Amendment rights by the federal government. *See supra* at 18. To the contrary, the Federal Laws explicitly permit the acquisition of handguns, and to the extent the laws impinge on Second Amendment rights, the imposition is purely incidental. Accordingly, Plaintiffs have not demonstrated irreparable harm even if they have demonstrated some possibility that their Second Amendment claims would succeed. As such, their request for a preliminary injunction should be denied.

## IV.    A PRELIMINARY INJUNCTION IS NOT IN THE PUBLIC INTEREST.

"In exercising their sound discretion, courts of equity should pay *particular regard* for the public consequences in employing the extraordinary remedy of injunction." *Real Truth*, 575 F.3d at 347 (quoting *Winter*, 129 S. Ct. at 376-77) (emphasis added by Fourth Circuit). Congress has broad economic, national defense, and public safety interests in regulating the national firearms

market.  And pursuant to its authority under the Commerce Clause, Congress has created a vast and interconnected network of laws and regulations governing that market.  *See* U.S. Const. art. I, § 8, cl. 3; *cf. Masciandaro*, 638 F.3d at 473 (discussing Congress's interest in regulating public safety under the Property Clause).  While Plaintiffs claim that the relief sought in this case "is exceedingly narrow," Pl. Mem. at 1, enjoining enforcement of the Federal Laws would in fact profoundly affect this framework and undermine the public interest.

Specifically, the Court cannot simply enjoin enforcement of the Federal Laws without rendering several additional laws in need of revision or rescission.  *See*, *e.g.*, 18 U.S.C. § 922(a)(2) (making it unlawful for licensees to ship or transport in interstate of foreign commerce any firearm to any person other than another licensee); *id.* § 922(a)(3) (making it unlawful for any person other than a licensee to transport into or receive a handgun from out of state); *id.* § 922(c)(1) (authorizing sales of firearms to persons who do not appear in person at a licensee's place of business provided certain conditions are met, where "not otherwise prohibited by this subchapter," *e.g.*, by § 922(b)(3)).  Similarly, laws regulating the transfer of rifles and shotguns would have to be revised to include handguns.  *See, e.g.*, 27 C.F.R. § 478.96(c)(1).  The public interest would not be furthered by having this Court—as opposed to Congress—substantially revise the framework governing interstate transfers of firearms.

Absent such comprehensive revisions to the firearm regulatory framework, enjoining the Federal Laws would at best render large portions of the framework unworkable, and at worst, result in significant portions of the interstate firearm market being unregulated.  Considering the potential for a vastly enlarged interstate handgun market should the Federal Laws be enjoined, and the above-referenced Congressional findings regarding the correlation between handguns and violent crime, a preliminary injunction also would seriously undermine public safety interests.

## V.    THE BALANCE OF EQUITIES TIPS IN THE GOVERNMENT'S FAVOR.

Finally, Plaintiffs' request for a preliminary injunction should be denied because the "balance of equities" tips squarely in favor of the federal government. *See Winter*, 129 S. Ct. at 381. Against the important public interests furthered by denying a preliminary injunction, *see supra* Section IV, Plaintiffs contend only that a preliminary injunction would protect their Second Amendment rights. Pl. Mem. at 19. But as with irreparable harm, *see supra* at 27-28, this argument presumes that the Federal Laws infringe upon those rights, and Plaintiffs have failed to demonstrate a likelihood that this is the case. *See supra* at 11-26. It also ignores the fact that Plaintiffs for a long time prior to this lawsuit chose not to exercise their Second Amendment rights. Therefore, because Plaintiffs' mere allegations of Second Amendment harms are substantially outweighed by the important government interests in upholding the Federal Laws, Plaintiffs' request for a preliminary injunction should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs' request to enjoin the Federal Laws should be denied.

Respectfully submitted,

NEIL H. MacBRIDE
UNITED STATES ATTORNEY

By:    _____/s/_____
Lauren A. Wetzler
Stephen J. Obermeier
Assistant United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3752/3785
Fax: (703) 299-3983
lauren.wetzler@usdoj.gov
stephen.obermeier@usdoj.gov

Date: July 15, 2011                    COUNSEL FOR THE ATTORNEY GENERAL

OF COUNSEL:
Melissa Anderson
Bureau of Alcohol, Tobacco, Firearms and Explosives
Office of Chief Counsel
99 New York Avenue, NE
Washington, D.C. 20226

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 8, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus Street, Ste. 405
Alexandria, VA 22314
alan@gurapossessky.com
Counsel for Plaintiffs

Catherine Crooks Hill
Office of the Attorney General
900 E Main St
Richmond, VA 23219
cchill@oag.state.va.us
Counsel for W. Steven Flaherty

Thomas L. Koger
Office of the Attorney General for the
District of Columbia
Assistant Attorney General
Equity I Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Thomas.Koger@dc.gov
Counsel for District of Columbia

_____/s/_____
Lauren A. Wetzler
Assistant United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3752
Fax:        (703) 299-3983
Email: lauren.wetzler@usdoj.gov
Counsel for the Attorney General