IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| MICHELLE LANE, et al., | ) Case No. 1:11-CV-00503-GBL-TRJ |
| | ) |
| Plaintiffs, | ) MEMORANDUM OF POINTS AND |
| | ) AUTHORITIES IN REPLY TO |
| v. | ) DEFENDANTS' BRIEFS OPPOSING |
| | ) PLAINTIFFS' MOTION FOR PRELIMINARY |
| ERIC HOLDER, et al., | ) INJUNCTION |
| | ) |
| Defendants. | ) |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) |

MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANTS'
BRIEFS OPPOSING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**COME NOW** the Plaintiffs, Michelle Lane, Matthew Welling, Amanda Welling, and the

Second Amendment Foundation, Inc., by and through undersigned counsel, and submit their

Memorandum of Points and Authorities in Reply to Defendants' Briefs Opposing Plaintiffs'

Motion for Preliminary Injunction.

Dated: July 13, 2011         Respectfully submitted,

Alan Gura (Va. Bar No. 68842)
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

By: /s/ Alan Gura
    Alan Gura

## TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      ALL PLAINTIFFS HAVE STANDING, AS DEFENDANTS ARE
        DIRECTLY CAUSING THE CONSTITUTIONAL INJURY. . . . . . . . . . . . . . . . . . . . . 3

II.     THE PROSPECTS OF LEGISLATIVE RELIEF ARE IRRELEVANT. . . . . . . . . . . . 10

III.    PLAINTIFFS ARE SUFFERING IRREPARABLE HARM. . . . . . . . . . . . . . . . . . . . . 12

IV.     PLAINTIFFS WILL SUCCEED ON THE MERITS.  . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.      The Second Amendment Protects the Right to Acquire Handguns. . . . . . . . . . . 13

        B.      The Fourth Circuit Mandates Application of Strict Scrutiny. . . . . . . . . . . . . . . 16

        C.      The Interstate Handgun Sales Ban Fails Any Level of Review. . . . . . . . . . . . . 17

V.      INJUNCTIVE RELIEF WILL ENHANCE, NOT HINDER, PUBLIC SAFETY. . . . . . . 20

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

TABLE OF AUTHORITIES

Cases

*Andrews* v. *State*,
50 Tenn. 165, 178 (1871).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bach* v. *Pataki*,
408 F.3d 75 (2d Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Dearth* v. *Holder*,
641 F.3d 499 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-5, 10

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14, 15

*Ezell* v. *City of Chicago*, ___ F.3d ___,
2011 U.S. App. LEXIS 14108 (7th Cir. July 6, 2011). . . . . . . . . . . . . 7-10, 12, 14, 17, 18

*Frank Krasner Enterprises, Ltd.* v. *Montgomery County*,
401 F.3d 230 (4th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Garcia* v. *Texas*,
564 U.S. ___, 2011 U.S. LEXIS 5019 (July 7, 2011) (per curiam). . . . . . . . . . . . . . . . . 11

*Heller* v. *District of Columbia*,
698 F. Supp. 2d 179 (D.D.C. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*McDonald* v. *City of Chicago*,
130 S. Ct. 3020 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Medellín* v. *Texas*,
554 U. S. 759 (2008) (per curiam). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Medimmune, Inc.* v. *Genentech, Inc.*,
549 U.S. 118 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*NAACP* v. *Button*,
371 U.S. 415 (1963).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Quince Orchard Valley Citizens Ass'n* v. *Hodel*,
872 F.2d 75 (4th Cir. 1989).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*San Diego County Gun Rights Comm.* v. *Reno*,
      98 F.3d 1121 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*The Real Truth About Obama, Inc.* v. *Federal Election Commission*,
      575 F.3d 342 (4th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States* v. *Chester*,
      628 F.3d 673 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16, 19

*United States* v. *Marzzarella*,
      614 F.3d 85 (3d Cir. 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*United States* v. *Masciandaro*,
      638 F.3d 458 (4th Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

*United States* v. *Salerno*,
      481 U.S. 739 (1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Woollard* v. *Sheridan*,
      2010 U.S. Dist. LEXIS 137031 (D. Md. Dec. 30, 2010).. . . . . . . . . . . . . . . . . . . . . . . 10


Statutes and Rules

D.C.M.R.24-2320.3(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. Civ. Proc. 65(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2


Other Authorities

H.J. Res. 102-438 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

H.J. Res. 103-81.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

H.J. Res.104-98. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

H.J. Res.105-61. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Liz Essley, "D.C. decides against becoming gun vendor,"
      *Washington Examiner*, July 13, 2011, available at
      http://washingtonexaminer.com/local/dc/2011/07/dc-decides-
      against-becoming-gun-vendor (last visited July 13, 2011).. . . . . . . . . . . . . . . . . . . . . . 11

PRELIMINARY STATEMENT

In the interests of judicial efficiency, considering the overlapping arguments raised by the Defendants, Plaintiffs submit a single reply brief to the various briefs opposing the grant of preliminary injunction.

* * *

For the most part, Defendants' briefs raise a wide variety of irrelevant, conflicting, and at-times spurious points. According to Defendants, they have not actually done anything—the lack of interstate handgun sales is purely voluntary—yet Defendants feel very strongly that they should not be enjoined from doing whatever it is that they are not doing, and they assure the Court that they are working fast to legislatively correct the problems they are not causing.

Defendants further aver that Plaintiffs are not injured by being deprived of the means of self-defense, and Plaintiffs must not be serious about seeking relief because it took them an entire three weeks to file their motion for preliminary injunction from the time the complaint was perfected. Meanwhile, although there is a fundamental right to keep and bear handguns, and the interstate handgun sales ban dates only to 1968, Defendants claim there is no right to actually purchase guns, or at least, no right to purchase handguns that must be analyzed under the Fourth Circuit's precedent.

Defendants stand on more solid ground averring a strong interest in ensuring that disqualified individuals be barred from obtaining handguns. Plaintiffs continue to accept this governmental interest as significant, regardless of whether it would be termed "compelling," "important," or something else. Doubtless, many regulations vindicating this governmental interest are and would be constitutional. But it is quite an illogical—and unconstitutional—leap, to move from accepting the government's regulatory interest in this area, to a complete ban on all

interstate handgun sales for all people at all times. The government is capable of tailoring the law more properly. The fact that it does not do so now has no bearing on whether the government's current conduct is constitutional. That, after all, is the point of a preliminary injunction: to force a defendant to conform its behavior to legal requirements. Defendants arguments are especially misplaced in this case, because whatever the situation might be with respect to other "states," under the terms of Plaintiffs' requested injunction, every D.C. resident's handgun transaction would still require approval of the District's police department.

Defendants do raise one valid point. The operative test for preliminary injunctions is stated in the re-issued portions of *The Real Truth About Obama, Inc.* v. *Federal Election Commission*, 575 F.3d 342 (4th Cir. 2009), *reissued*, 607 F.3d 355 (4th Cir. 2010). *Real Truth* requires all four preliminary injunction factors be satisfied rather than the balance-of-harms test previously used in this circuit, which should not have been cited.

Yet Plaintiffs have plainly argued well-beyond a harm-balancing exercise. Plaintiffs asserted, and continue to assert, the existence of all four preliminary injunction factors, and they have argued and continue to argue most forcefully for the one factor that the previous balance-of-harms test minimized: likelihood of success on the merits. Indeed, Plaintiffs' request for advancement under Fed. R. Civ. Proc. 65(a)(2) underscores the fact that they are not seeking an injunction based merely on the creation of some doubt as to the challenged laws. While the parties vigorously disagree about the law, there apparently exists no dispute as to the basic facts of this controversy.

The motion must be granted.

Each of Defendants' substantive arguments are addressed in turn.

2

ARGUMENT

I.     ALL PLAINTIFFS HAVE STANDING, AS DEFENDANTS ARE DIRECTLY
       CAUSING THE CONSTITUTIONAL INJURY.

The District and Holder argue that Plaintiffs lack standing, because their inability to

obtain handguns is caused only by the "unfettered choices of independent actors," Holder Br., at

7, and "it is not the fault of the District that there are no FFLs in the District willing to assist

[Plaintiffs]," Dist. Br., at 5. All three Defendants dispute Plaintiff Second Amendment

Foundation, Inc.'s ("SAF") standing.

The standing arguments border on the frivolous, and seriously miscomprehend the nature

of Plaintiffs' complaint. The Defendants are enforcing criminal laws that threaten dealers in a

heavily-regulated industry with substantial criminal penalties for transferring handguns to out-of-

state residents, and also criminalize the Plaintiffs' acquisition of handguns other than through in-

state licensed dealers. Holder demands gun purchasers fill out a form disclosing residency, which

is utilized to enforce a residency-based restriction against consumers. Yet somehow, the

Defendants have *nothing* to do with Plaintiffs' inability to acquire handguns? If people only

refrain from interstate handgun sales of their own free will, Defendants should be unconcerned

with whether injunctive relief is granted, and declare that they are immediately ceasing their

enforcement of the relevant laws.

Defendants fail to address the D.C. Circuit's recent, flatly-contrary holding against

Defendant Holder on the subject of how he causes Article III injuries to prospective gun

purchasers, *Dearth* v. *Holder*, 641 F.3d 499, 2011 U.S. App. LEXIS 7737 (D.C. Cir. Apr. 15,

2011). In *Dearth*, an expatriated American and Plaintiff SAF sued Defendant Holder to overturn

3

the federal prohibition on acquisition of firearms by Americans residing overseas. Impacted individuals could not successfully fill out an ATF Form 4473, required for all retail firearms transactions, because doing so would reveal that they are not entitled to complete the transaction based on their residence status.

The D.C. Circuit held Dearth had standing. "We agree with Dearth that the Government has denied him the ability to purchase a firearm and he thereby suffers an ongoing injury." *Dearth*, 2011 U.S. App. LEXIS 7737 at *5. Holder argued that the government did not actually cause an injury to Dearth because it did not deny him a gun registration akin to that denied in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), but the D.C. Circuit disagreed: "the Government cannot so easily avoid suit when it has erected a regulatory scheme that precludes Dearth from truthfully completing the application form the Government requires for the purchase of a firearm." *Id.*, at *6. Holder also argued that Dearth's injury was conjectural, but the D.C. Circuit rejected this theory, too. "Dearth, moreover, is not alleging merely an 'injury at some indefinite future time;' he claims he presently suffers a cognizable injury to his constitutional rights because the federal regulatory scheme thwarts his continuing desire to purchase a firearm." *Id.*, at *9. "[Dearth's] injury is present and continuing." *Id.*, at *10.

Plaintiffs' standing predicate is identical. *See* First Amended Complaint, ¶¶ 21, 22. Just like Dearth, Plaintiffs are barred from purchasing firearms on account of their residence, and they cannot successfully complete a Form 4473. Plaintiff Lane has gone so far as to actually order handguns that are sitting in the store, waiting for her to be able to fill out the form.[1]

---

[1]Flaherty offers a "cynic" would suggest that Lane's handgun purchase attempt was a ploy to create standing. Flaherty Br., at 8 n.6. The cynic would be wrong as to the facts (Lane did not know Sykes' lease status), and wrong as to the law (standing does not require a purchase attempt,

4

Defendants assert it is not their fault that nobody can open a gun store in Washington. That would be a dispute for another day and a different court, across the river. *Plaintiffs are not attacking the District's lack of FFLs.* The dispute here would remain even were the city inundated with gun dealers. The problem, as the First Amended Complaint makes quite clear, is that Defendants are "banning and otherwise burdening access to handguns whose possession is protected by the Second Amendment," First Am. Compl., ¶¶ 26, 28, 31, 33, 35, and they are doing so in Virginia. However the District of Columbia regulates handguns within its borders is absolutely not at issue here, and would be left undisturbed by the requested injunction.

Defendant Holder responds that "the Second Amendment does not give Plaintiffs a right to possess firearms *from Virginia* for self-defense," Holder Br., at 10 n.9, but this claim confuses standing with the merits, which it also fails (see below). The question of whether a particular transaction is constitutionally-protected, however that question might ultimately be answered, goes to the merits of the case—not to whether the Plaintiffs' claimed injury, here, the frustration of firearms sales, is fairly traceable to some act of the Defendants. Without any question, it is.

Holder's responsibility is the same one found in *Dearth*: the distribution of ATF Form 4473 that utilizes Plaintiffs' residency as a bar, and the surrounding criminal liability for any acquisition barred by the challenged residency requirement. As for the District, it is simply false that "plaintiffs do not complain of any direct action by the District itself." Dist. Br. 7. To recap: D.C.M.R.24-2320.3(f) mandates that Plaintiffs, while shopping for handguns in Virginia, "have that firearms dealer transport the applicant's pistol to a licensed firearms dealer in the District . .

_____

see e.g. *Bach* v. *Pataki*, 408 F.3d 75 (2d Cir. 2005), and strategic civil rights litigation is a time-honored feature, not a bug, in our legal system. *See e.g. NAACP* v. *Button*, 371 U.S. 415 (1963)).

5

." It is decidedly *not* anyone's "unfettered choice," *Frank Krasner Enterprises, Ltd.* v. *Montgomery County*, 401 F.3d 230, 234 (4th Cir. 2005), to "transport the applicant's pistol" to an in-District dealer. It is a mandate of the regulations being challenged by Plaintiffs.

In *Krasner*, the government simply made the decision as a market participant not to fund venues that hosted gun shows. What the venues did with that was their business—they remained free to host the plaintiffs' gun shows upon forfeiting government funds. Here, there is nothing optional about what Plaintiffs must do. If Plaintiffs do not "have" their Virginia gun dealers ship the handguns into the District, they will not be able to own those handguns. And if Plaintiffs take possession of handguns outside their home states, Defendants Flaherty and Holder will arrest and prosecute them. Defendants' actions operate directly.

Defendants' reliance on the pre-*Heller* case of *San Diego County Gun Rights Comm.* v. *Reno*, 98 F.3d 1121 (9th Cir. 1996) is notably limited. As Defendant Holder conceded, the Ninth Circuit's rejection of that case's Second Amendment claim would now be barred by *Heller*. Holder Br., at 8 n.7. But there are other aspects of *San Diego* that Defendants carefully avoid invoking—and this avoidance warrants comment. In addition to the economic injury arguments Defendants cite, the Ninth Circuit held that the plaintiffs lacked standing because they could not show the threat of an "imminent" prosecution. *San Diego*, 98 F.3d at 1126 (citation omitted).

That is no longer good law, if it ever was. While a prosecutorial threat must be credible, in the sense that it must be presently impacting a plaintiff, a prosecution need not be *imminent*—a doctrine that would provide the government with a pocket veto over any pre-enforcement litigation by concealing its intentions. The Supreme Court has since rejected this requirement. "The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent

6

threat of prosecution, but nonetheless does not eliminate Article III jurisdiction." *Medimmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 129 (2007). Reviewing its pre-enforcement standing cases, the Supreme Court explained, "[i]n each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do . . . That did not preclude subject matter jurisdiction because the threat eliminating behavior was effectively coerced." *Id.*

Turning to *San Diego*'s economic-injury aspects that Defendants *do* invoke, these are clearly inapposite. First, under the Ninth Circuit's unique-for-its-time doctrine, that circuit did not merely adopt the ordinary, erroneous "collective rights" view of the Second Amendment. In the Ninth Circuit, interpretation of the Second Amendment as a "collective right" was applied as a *standing* doctrine. Hence, when *San Diego* rejected the plaintiffs' Second Amendment claims, it spoke in terms of their lack of standing to bring suit. *San Diego*, 98 F.3d at 1124-25. As the Ninth Circuit duly noted, the economic injury arguments cited by Defendants applied only to Commerce Clause claims. *San Diego*, 98 F.3d at 1125 n.2. Had the Ninth Circuit's collective rights theory not been a standing doctrine, the court would have confronted the question of whether prohibiting the plaintiffs' guns transactions constituted injury–the very issue here.

This distinction highlights Defendants' failure to understand the nature of Plaintiffs' facial challenges, and their claim of injury. The economic impact of banning commerce is one manifestation of the harm, but again, the basic injury is that transactions are being barred. The Seventh Circuit's opinion last week, preliminarily enjoining enforcement of Chicago's ban on gun ranges, explains this distinction at some length. *Ezell* v. *City of Chicago*, ___ F.3d ___, 2011 U.S. App. LEXIS 14108 (7th Cir. July 6, 2011). In *Ezell*, the District Court denied the motion for preliminary injunction, theorizing that plaintiffs who sought to use gun ranges were

only harmed by the added expense of traveling outside the city to do so. The Court of Appeals reversed. "The plaintiffs have challenged the firing-range ban on its face, not merely as applied in their particular circumstances. In a facial constitutional challenge, individual application facts do not matter. Once standing is established, the plaintiff's personal situation becomes irrelevant." *Ezell*, at \*26. (Plaintiffs here also assert both as-applied and facial challenges).

> Here, the judge zeroed in on the occasional expense and inconvenience of having to travel to a firing range in the suburbs, but that's not the relevant constitutional harm. The plaintiffs contend that the Second Amendment protects the right to maintain proficiency in firearm use--including the right to train at a range--and the City's complete ban on range training violates this right. They also claim that the range ban impermissibly burdens the core Second Amendment right to possess firearms at home for protection because the Ordinance conditions lawful possession on range training but makes it impossible to satisfy this condition anywhere in the city. If they're right, then the range ban was unconstitutional when enacted and violates their Second Amendment rights every day it remains on the books. These are not application-specific harms calling for individual remedies.

*Ezell*, 2011 U.S. App. LEXIS 14108 at \*29.

Plaintiffs' claim is identical. To be sure, it is specious to suggest that banning individuals from engaging in commercial transactions outside their state only *theoretically* causes them economic injury. And at least *some* of the economic injuries wrought by the interstate handgun sales ban are directly attributable to government action. For example, when the government directs that people transport a handgun to an in-state dealer, that transportation expense and the second dealer's service fees are occasioned only by the government's mandate. But in any event, the causes of action listed in the First Amended Complaint speak of "banning and otherwise burdening" protected firearm transactions, and this the Defendants unquestionably, *directly*, do.

Defendant Holder also asserts that facial invalidity of the interstate handgun sales ban is unavailable, because the law would be constitutional as-applied to at least some people, invoking

8

the test of *United States* v. *Salerno*, 481 U.S. 739, 745 (1987). Holder Br., at 12-13 n.11. Alas,

the *Salerno* standard does not apply in Second Amendment cases, at least not in this circuit.

Because *Salerno* is not applied in, among other types of cases, First Amendment cases, Judge

Davis specifically dissented from the panel majority's decision to adopt First Amendment

standards for the Second Amendment in *United States* v. *Chester*, 628 F.3d 673, 687-88 (4th Cir.

2010) (Davis, J., concurring in judgment). Clearly, that argument did not carry the day.

     Nor should it have. The Seventh Circuit's recent decision in *Ezell* explains the limited

utility of the *Salerno* standard in questioning its use in that Second Amendment case. *Ezell*, 2011

U.S. App. LEXIS 14108 at *27-*30. It is also easy to see that a "no set of circumstances" rule

conflicts with *Heller*, which struck down Washington, D.C.'s bans on handguns and functional

firearms, but clearly advised that dangerous individuals would not be entitled to exercise Second

Amendment rights. Under a *Salerno* standard, this result would be impossible, because there

remain individuals whose circumstances continue to justify disarmament. The Second

Amendment does not dictate all-or-nothing, everyone or no-one outcomes.

     As for SAF's standing, Holder simply states that Plaintiff's declaration does not establish

it. Flaherty and the District make a greater effort to challenge SAF's standing, but all are wrong.

The Seventh Circuit just expressly affirmed SAF's standing to challenge Chicago's ban on gun

ranges, based on a very similar declaration from Ms. Versnel.

> The Second Amendment Foundation and the Illinois Rifle Association have many
> members who reside in Chicago and easily meet the requirements for associational
> standing: (1) their members would otherwise have standing to sue in their own right; (2)
> the interests the associations seek to protect are germane to their organizational purposes;
> and (3) neither the claim asserted nor the relief requested requires the participation of
> individual association members in the lawsuit.

*Ezell*, 2011 U.S. App. LEXIS 14108 at *22 (citations omitted).

Moreover, with respect to this point, Defendant Holder's claims about *Dearth* are demonstrably false. Holder Br., at 9 n.8. Contrary to Holder's statement here, SAF vigorously challenged the lower court's adverse decision on its standing. Appellants' opening brief in that case contained an argument entitled, "The Second Amendment Foundation Has Organizational and Representational Standing," which ran for eight pages. The reply brief added another three pages distinctly dedicated to that topic. And in reversing the district court, the D.C. Circuit made no reservations. It simply did not reach the issue, citing precedent holding that when one plaintiff has standing, the standing of the other plaintiffs need not be examined. *Dearth*, at *11 n.***.

This last point was also upheld by the Seventh Circuit in *Ezell*, 2011 U.S. App. LEXIS 14108 at *22-*23 n.7, and by the District of Maryland in affirming SAF's standing to contest Maryland gun licensing laws. *Woollard* v. *Sheridan*, 2010 U.S. Dist. LEXIS 137031 at *2 n.1 (D. Md. Dec. 30, 2010).  Although SAF has standing in its own right, the Court should not even reach that question once it satisfies itself that any of the individual Plaintiffs have standing.

II.     THE PROSPECTS OF LEGISLATIVE RELIEF ARE IRRELEVANT.

Although Defendants vigorously deny having anything to do with banning interstate firearms transactions, they disingenuously point to the prospects that they might someday mitigate the harm they cause. The District notes that "Mr. Sykes has stated that he will re-open his business," Dist. Br., at 3, but Sykes now sings a different tune, in the article presented as Defendant Holder's Exhibit A, lamenting that the city is making it impossible for him to re-open.

Defendant Holder, for his part, argues that the D.C. City Council "reportedly recognizes the issue and is working to solve it," Holder Br., at 2, but even that is false. The City Council

10

made no moves to rescind the interstate handgun sales ban. It considered—and yesterday

rejected—a move to become a federally-licensed firearms retailer to the public. *See* Liz Essley,

"D.C. decides against becoming gun vendor," *Washington Examiner*, July 13, 2011, available at

http://washingtonexaminer.com/local/dc/2011/07/dc-decides-against-becoming-gun-vendor (last

visited July 13, 2011).[2]

These half-hearted measures and platitudes only underscore the urgency of granting relief.

They do not, for one moment, alter the equation presented to the Court. On the eve of

Defendants' opposition briefs, the Supreme Court rejected the last-minute appeal of a death row

inmate who claimed that pending legislation would provide him with a means of contesting his

sentence. "Our task is to rule on what the law is, not what it might eventually be." *Garcia* v.

*Texas*, 564 U.S. ___, 2011 U.S. LEXIS 5019 at *3 (July 7, 2011) (per curiam). This is not the

first time that a man was executed notwithstanding his pleas that the law *might* change. *Medellín*

v. *Texas*, 554 U. S. 759, 760 (2008) (per curiam).

The relief sought by Plaintiffs is less drastic than the death penalty—and unlike the death

penalty, easily reversible should the government truly take steps to moot the dispute. But no such

steps are contemplated. Plaintiffs' present irreparable harm will continue unabated for the

foreseeable future. In this, and every other circuit, the touchstone for injunctive relief is whether

Plaintiffs are *presently* suffering irreparable harm, not whether the irreparable harm might

---

[2]In any event, the concept of having a municipality obtain a Federal Firearms License and engage in the retail trade of firearms is, to say the least, novel. It is unclear that the District's charter allows it to sell firearms to private individuals, or that the District is eligible to possess a Federal Firearms License. Nor is it clear when, assuming all these hurdles could be cleared, BATFE would license the District of Columbia, or how the District would interact with customers.

someday go away. Nor can the Court constructively deny a motion for preliminary injunction by refusing to rule on it because circumstances might eventually change.

The District's last handgun ban lasted thirty-four years notwithstanding perennial legislative attempts to repeal it. One such attempt even came in the wake of the D.C. Circuit's decision in *Heller* (then known as *Parker* v. *District of Columbia*), in an effort to moot the case and obtain a vacatur of the D.C. Circuit's opinion pending the Supreme Court's intervention. The notion that legislative relief is just around the corner here is spurious.[3]

III.     PLAINTIFFS ARE SUFFERING IRREPARABLE HARM.

There is not too much to add to this point. Defendants simply do not take seriously the individual interest in self-defense. But it should be self-evident that if handgun possession is *constitutionally-secured* because the Framers placed such a high value on individual self-defense, the violation of that right could lead to catastrophic tragedy. The Seventh Circuit agrees:

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on "the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." The Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. Infringements of this right cannot be compensated by damages.

*Ezell*, 2011 U.S. App. LEXIS 14108 at *32 (citations and footnote omitted).

The District invokes Judge Wilkinson's statement that "This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *United*

---

[3]Likewise, Congress frequently sees proposed constitutional amendments repealing the Second Amendment or declaring it inapplicable to individuals. *See, e.g.* H.J. Res.105-61; H.J. Res.104-98; H.J. Res. 103-81; H.J. Res. 102-438. That is no reason to avoid deciding this case.

*States* v. *Masciandaro,* 638 F.3d 458, 475 (4th Cir. 2011). Plaintiffs agree. No court should desire

the position of thinking itself "minutely responsible" for the death of an innocent person because

it "miscalculated as to Second Amendment rights," leaving the victim without arms for her

defense.

Defendants further claim that Plaintiffs are not irreparably harmed because they allegedly

waited five weeks from the filing of the initial complaint, to the filing of the motion for

preliminary injunction. The claim is specious. This is not a case where plaintiffs delayed

contesting construction permits for nine months, during which time planning and construction

ensued. *Quince Orchard Valley Citizens Ass'n* v. *Hodel*, 872 F.2d 75 (4th Cir. 1989). It takes time

to adequately prepare a motion for preliminary injunction in a case of this nature. The initial

complaint was filed rather quickly, and work ensued on preparing this motion. When in the

course of researching the matter it became apparent that the District was a necessary party, the

complaint had to be amended, and additional time expended. A space of three weeks between the

filing of the amended complaint, and the motion, is minor, and quite reasonable.

IV.   PLAINTIFFS WILL SUCCEED ON THE MERITS.

A.   The Second Amendment Protects the Right to Acquire Handguns.

Defendants offer risible arguments resisting this most common-sense and obvious

proposition: when there is a right to possess handguns, there is the right to *acquire* them. The

District irrationally reads this as "the equivalent of saying that the government must

somehow facilitate 'access' to deadly weapons." Dist. Br., at 18. Nonsense. The Plaintiffs are

not asking for the government to do anything other than stop interfering with their attempts to

acquire handguns. To say that the government should not ban books is not to claim the positive

13

right to government bookstores, and the First Amendment's Free Exercise Clause does not

literally conflict with the Establishment Clause. Likewise with firearms.

Defendant Holder also grudgingly refuses to acknowledge a right to acquire handguns,

because (1) gunpowder was regulated in the Framing Era, and (2) states have long prohibited the

sale of certain weapons, Holder Br., at 13. This is meaningless. The gunpowder argument failed

in *Heller*, it failed in *Ezell*, and it fails here. In *Heller*, the District pointed to various early

American fire suppression ordinances that suggested guns could be banned or heavily regulated,

but the Supreme Court was unimpressed, refusing to stretch the import of those laws beyond

their most obvious propositions. *Heller*, 554 U.S. at 631-32. Somehow, the Supreme Court still

found an historic right to keep and bear handguns.

Chicago attempted the same gambit in *Ezell*, offering ancient fire-suppression and

firearm-discharge regulations as justification for its total ban on gun ranges, but the Seventh

Circuit was unimpressed. *Ezell*, 2011 U.S. App. LEXIS 14108 at *49-*51. "These 'time, place,

and manner' regulations do not support the City's position that target practice is categorically

unprotected." *Ezell*, at *51. The Seventh Circuit had no trouble discerning that there is, in fact, an

ancillary Second Amendment right to practice with one's firearm. "The right to possess firearms

for protection implies a corresponding right to acquire and maintain proficiency in their use; the

core right wouldn't mean much without the training and practice that make it effective." *Ezell*,

2011 U.S. App. LEXIS 14108 at *48. It should not be hard to discern that the right to possess

handguns implies a corresponding right to acquire them.

Defendant Holder's argument relating to bans on types of firearms is not serious. Of

course the possession of some weapons will not be protected by the Second Amendment. *Heller*

14

offered a great deal of guidance as to how protected arms must be delineated from non-protected arms, but what matters here is only *Heller*'s conclusion: handguns are, categorically, a protected class of arms. Even if *some* handguns, for specific reasons, could be banned, laws that generally address all handguns will receive Second Amendment scrutiny. As one Fourteenth Amendment-era court held, "[t]he right to keep and bear arms, necessarily involves the right to purchase them . . ." *Andrews* v. *State*, 50 Tenn. 165, 178 (1871).

Nor would it be a serious argument to claim that because some "laws imposing conditions and qualifications on the commercial sale of arms" are appropriate, *Heller*, 554 U.S. at 626-27, *all* such regulations are presumptively constitutional. As the Third Circuit explained,

> Commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment . . . In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*.

*United States* v. *Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010).

Defendant Holder, at least, appears to not quite go that far. While he questions the existence of a right to acquire handguns, he also justifies the interstate handgun sales ban as a "de minimis" burden. *See, e.g.* Holder Br., at 12, 15. This is not a logical argument with respect to the existence of the right. Just as Holder earlier confused standing with the merits, here, he confuses the existence of a right with the question of whether it is violated. These are separate considerations. As an initial matter, the Court should acknowledge that the acquisition of handguns falls within the Second Amendment. Whether the challenged laws regulating that conduct satisfy constitutional standards is only the next logical inquiry.

15

B.      The Fourth Circuit Mandates Application of Strict Scrutiny.

The Fourth Circuit's discussions of strict scrutiny in *United States* v. *Masciandaro,* 638

F.3d 458, supra, and *United States* v. *Chester*, supra, 628 F.3d 673, were not, as Holder suggests,

"dicta." The Fourth Circuit was explaining its reasoning in applying the levels of scrutiny that it

applied in those cases. The discussion was necessary to the decision. And even if these

statements could be deemed "dicta," they nonetheless offer the considered reasoning of the

binding appellate court. When multiple opinions by different Fourth Circuit panels instruct that

"we assume that any law that would burden the 'fundamental,' core right of self-defense in the

home by a law-abiding citizen would be subject to strict scrutiny," *Masciandaro*, 638 F.3d at 470

(citation omitted), and offer that strict scrutiny secures the Second Amendment rights of "*law-

abiding*, responsible citizen[s]," *Chester*, 628 F.3d at 683 (emphasis original), this Court should

heed those instructions.

The Fourth Circuit is not alone in taking this approach to the Second Amendment. In

*Marzzarella*, the Third Circuit affirmed the federal ban on obliteration of serial numbers under

intermediate scrutiny, explaining that the law "is more accurately characterized as a regulation of

the manner in which persons may lawfully exercise their Second Amendment rights," that is,

with firearms that bear serial numbers. *Marzzarella*, 614 F.3d at 97. Analyzing from the First

Amendment doctrine regarding time, place, and manner, the Third Circuit concluded the law

"should merit intermediate, rather than strict, scrutiny." *Id.* The unmistakable import of this logic

is that strict scrutiny applies to laws impacting the Second Amendment right's core.

The Seventh Circuit, for its part, just demanded that Chicago offer "a more rigorous

showing than that demanded [under intermediate scrutiny]" to justify its gun range ban, "if not

16

quite 'strict scrutiny.'" *Ezell*, 2011 U.S. App. LEXIS 14108 at *60. *Ezell* is critical, because that

court essentially followed the Fourth Circuit's approach, rasing raise the level of scrutiny in cases

where the claimants are law-abiding, responsible citizens, and the case involves "an important

corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* As

the Seventh Circuit explained,

> First, a severe burden on the core Second Amendment right of armed self-defense will
> require an extremely strong public-interest justification and a close fit between the
> government's means and its end. Second, laws restricting activity lying closer to the
> margins of the Second Amendment right, laws that merely regulate rather than restrict,
> and modest burdens on the right may be more easily justified. How much more easily
> depends on the relative severity of the burden and its proximity to the core of the right.

*Ezell*, 2011 U.S. App. LEXIS at *59.

The District's continual citations to the District Court's opinion in *Heller* v. *District of*

*Columbia*, 698 F. Supp. 2d 179 (D.D.C. 2010) ("Heller II"), appeal pending, No. 10-7036 (D.C.

Cir.), for the proposed application of what it claims to be intermediate scrutiny, are inapposite.

That portion of *Heller II* has already been abrogated by the opinion's own terms. The court

reasoned that strict scrutiny could not apply because in *Heller*, "the Supreme Court did not

explicitly hold that the Second Amendment right is a fundamental right . . . If the Supreme Court

had wanted to declare the Second Amendment right a fundamental right, it would have done so

explicitly." *Id.*, at 187. Three months after these words were written, the Supreme Court declared

the Second Amendment right "fundamental." *McDonald* v. *City of Chicago*, 130 S. Ct. 3020,

3042 (2010) (plurality opinion) & 3059 (Thomas, J., concurring). So much for that.

C.      The Interstate Handgun Sales Ban Fails Any Level of Review.

Ultimately, whether strict or intermediate scrutiny apply should not matter, because the

17

interstate handgun sales ban fails both tests. Since people have the right to acquire handguns, period, they cannot, without more, have that right banned in one location because it might be exercised somewhere else (an illusory promise, in the case of District residents today). The City of Chicago unsuccessfully offered that argument in justifying its total prohibition of gun ranges, eliciting this explanation from the Seventh Circuit:

> This reasoning assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction. That's a profoundly mistaken assumption. In the First Amendment context, the Supreme Court long ago made it clear that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." The same principle applies here. It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free-speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs. That sort of argument should be no less unimaginable in the Second Amendment context.

*Ezell*, 2011 U.S. App. LEXIS at \*25-\*26 (citations and internal quotation marks omitted).

While Defendants' "move along" type argument is utterly devoid of merit, their assertion that the interstate handgun sales ban is required to prevent prohibited people from obtaining handguns warrants closer examination. Plaintiffs readily concede that the government has a very strong interest in keeping handguns out of the hands of people who should not have them. The general concept that the government may ban legitimately prohibited persons from acquiring handguns is not seriously disputed by anyone—certainly, not by the Plaintiffs in *this* action.

Logic dictates that if the government wants to prevent prohibited persons from obtaining handguns, it should impose an appropriate background check system. Indeed, one such system already exists. Yet Defendants complain that state-level handgun-specific disqualifiers are not in the system. Very well—perhaps they should be added to the system. And if the government creates appropriate, new categories of prohibited persons, then those persons should be added to

18

the system as well. For example, recent discussion has focused on whether individuals on the government's no-fly list should be added to NICS. Whatever the merits of this proposal, nobody seriously proposes that all handgun sales in America be stopped because no-fly individuals are not in the NICS system. The rule is simple: the government should seek to bar *prohibited persons* from acquiring arms, not bar *everyone* because *someone* might be prohibited.

The costs of adding state-level handgun disqualifications to the NICS system are irrelevant. Until very recent times, the NICS system itself was not even technologically feasible. Indeed, for most of American history, comprehensive background checks for residency, mental illness, and criminal records were simply impossible. Yet if the background check system is constitutional today, it would have been, if feasible, constitutional in 1791 or 1868. The system's lack of feasability in 1791 or 1868 would not have justified prohibitions on the sale of handguns.

Strict and intermediate scrutiny both require some level of close fit between the government's interests and the laws it enforces. The United States has previously "conceded that some form of strong showing ('intermediate scrutiny' many opinions say), is essential," under which laws are "valid only if substantially related to an important governmental objective." *Chester*, 628 F.3d at 683 (citation omitted). "Significantly, intermediate scrutiny places the burden of establishing the required fit squarely upon the government." *Id.* (citation omitted).

Respectfully, even under this intermediate level of scrutiny, the government fails to carry its burden of showing that *all* interstate handgun sales must be banned, to law-abiding people, as an appropriate fit to advance its interest. The existence of the NICS background check system, and the fact that interstate rifle and shotgun sales are allowed, tend to indicate that the current ban is excessive. Arguments that handguns are especially dangerous, etc., are simply frivolous

19

after *Heller*. Handguns are protected arms, and there is no reason to suppose that the same type

of background check system used to search for federal firearms disqualifiers will not effectively

ferret out state handgun disqualifiers—unless the federal government offers that it can ban all

handgun sales by adopting the allegedly uncheckable state disqualifiers that might currently exist.

V.     INJUNCTIVE RELIEF WILL ENHANCE, NOT HINDER, PUBLIC SAFETY.

Defendants fail to acknowledge that under the terms of the requested injunction, no D.C.

resident could acquire handguns without receiving police authorization to take possession of the

handgun. Indeed, another alternative better fitting the claimed governmental interest here would

require out-of-state handgun purchasers to present state-issued handgun purchase authorizations,

just as D.C. residents already must—and just as Virginia (and most other states) accept out-of-

state permits to carry handguns, an activity that has vastly greater implications for public safety.

The Second Amendment's existence reflects an understanding that law-abiding,

responsible people's possession of handguns is a public benefit. Defendants wholly, improperly,

ignore this basic premise of the Second Amendment.

CONCLUSION

The motion should be granted.

Dated: July 13, 2011                     Respectfully submitted,

Alan Gura (Va. Bar No. 68842)
GURA & POSSESSKY, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

By: /s/ Alan Gura_____
Alan Gura
Attorney for Plaintiffs

20

CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of July, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

Anna Elizabeth Cross
U. S. Attorney Office
2100 Jamieson Avenue
Alexandria, VA 22314
anna.cross@usdoj.gov
Counsel for Eric Holder

Catherine Crooks Hill
Office of the Attorney General
900 E Main St
Richmond, VA 23219
cchill@oag.state.va.us
Counsel for W. Steven Flaherty

Thomas L. Koger
Office of the Attorney General for the
District of Columbia
Assistant Attorney General
Equity I Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Thomas.Koger@dc.gov
Counsel for District of Columbia

/s/ Alan Gura
Alan Gura
GURA & POSSESSKY, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665
alan@gurapossessky.com
Counsel for Plaintiffs