IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| MICHELLE LANE, et al., | ) |
| Plaintiffs, | ) Civil No. 11-503 |
| VS. | ) July 15, 2011 |
| ERIC HOLDER, et al., | ) |
| Defendants. | ) |

MOTIONS HEARING

BEFORE:     THE HONORABLE GERALD BRUCE LEE
            UNITED STATES DISTRICT JUDGE

APPEARANCES:

 FOR THE PLAINTIFF: GURA & POSSESSKY PLLC
                    BY: ALAN GURA, ESQ.


 FOR THE DEFENDANT: OFFICE OF THE U.S. ATTORNEY
                    BY: LAUREN WEXLER, ESQ.
                        STEVEN OBERMEIER, ESQ.
                    BUREAU OF ALCOHOL TOBACCO FIREARM &
                    EXPLOSIVES
                    BY: MELISSA ANDERSON, ESQ.

                    OFFICE OF THE CORPORATION COUNCIL
                    BY: THOMAS L. KOGER, ESQ.
                        ANDREW SANDING, ESQ.

                    OFFICE OF THE ATTORNEY GENERAL
                    BY: GEORGE CHABALEWSKI, ESQ.
                        CATHERINE HILL, ESQ.

OFFICIAL COURT REPORTER: RENECIA A. SMITH-WILSON,RMR, CRR
                         U.S. District Court
                         401 Courthouse Square, 5th Floor
                         Alexandria, VA  22314
                         (703)501-1580

<u>INDEX</u>

ARGUMENT BY THE PLAINTIFF    15

ARGUMENT BY THE DEFENDANT     4,  8,  12

RULING BY THE COURT          25

---

1            (Thereupon, the following was heard in open

2    court at 10:45 a.m.)

3            THE CLERK:  1:11 civil 503, Michelle Lane, et

4    al versus Eric Holder, et al.

5            MS. WEXLER:  Good morning, Your Honor.

6    Lauren Wexler on behalf of Attorney General, Eric Holder.

7            With me at counsel table is my colleague,

8    Steven Obermeier and Melissa Anderson from the Bureau of

9    Alcohol Tobacco Firearms and Explosives.

10           THE COURT:  Good morning.

11           MR. GURA:  Good morning, Your Honor.  Alan

12   Gura for the plaintiffs.

13           THE COURT:  Good morning, Mr. Gura.

14           MR. KOGER:  Good morning, Your Honor.  Thomas

15   Koger for the District of Columbia --

16           THE COURT:  I'm sorry.  I could not hear what

17   you said.

18           MR. KOGER:  I beg your pardon, Your Honor.

19           Thomas Koger for the District of Columbia,

20   with Andy Sanding from my office.

21           MR. SANDING:  Good morning, Your Honor.

22           THE COURT:  Good morning.

23           MR. CHABALEWSKI:  Good morning, Your Honor.

24   George Chabalewski with the Office of the Attorney

25   General on behalf of the Superintendent.

1           With me also is Mrs. Catherine Hill from the
2   Office of the Attorney General.
3           THE COURT:  Good morning.
4           MS. HILL:  Good morning.
5           THE COURT:  I'm prepared to take the matter
6   up now, and if you all have a suggestion about who wants
7   to go first, I'm open to that suggestion.
8           My thought is that the order in which you are
9   named in the complaint with the Attorney General being
10  named first might be a way to proceed, but I'm open to
11  any suggestion you have, if you all have talked about
12  order.
13          MS. WEXLER:  Your Honor, from the defendant's
14  standpoint, I think we had planned to have the Attorney
15  General go first, the Superintendent go second and the
16  District of Columbia go third.
17          THE COURT:  All right.  Then the Attorney
18  General has the podium.
19          MS. WEXLER:  Thank you, Your Honor.
20          The issue before the Court, at least as to
21  the Attorney General is whether this Court should issue a
22  mandatory nationwide preliminary injunction prohibiting
23  the Attorney General from enforcing a law imposing
24  conditions or qualifications on the commercial sale of
25  firearms, a presumptively lawful measure under the

1    Supreme Court's decision in *Heller* and a law that does

2    not bar anyone from buying a handgun at all, even out of

3    state.

4            All the law does is say that if -- in effect,

5    is that if someone does buy a handgun out of state, then

6    they need to transfer it through an instate federal

7    firearm licensee.

8            Under these circumstances, Your Honor, the

9    Court -- the answer to the question is clearly no.  The

10   Court should not enter such a preliminary injunction and

11   particularly in light of the development last night with

12   the filing of D.C.'s declarations showing that D.C. is

13   taking steps to insure that its residents will be able to

14   resume obtaining firearms.

15           THE COURT:  I appreciate what you just said.

16           Would you address the issue of standing

17   first?

18           MS. WEXLER:  I would, Your Honor.

19           THE COURT:  Thank you.

20           MS. WEXLER:  As I briefly explained,

21   plaintiffs can't establish standing because they cannot

22   satisfy the traceability element of standing.

23           The problem here, Your Honor, does not arise

24   from our laws that are at issue here, 922(b)(3) and the

25   implementing regulation.

1          THE COURT:  Let's make sure we set the

2   context.  Ms. Lane wants to buy a gun and she lives in

3   Washington.

4          MS. WEXLER:  That's correct.

5          THE COURT:  And in order to do that, she has

6   to buy the gun out of state.  She has to purchase it from

7   a federally licensed firearms dealer, and she's made

8   arrangements to do that from a firearms dealer in Lorton,

9   Virginia; is that right?

10          MS. WEXLER:  She has to purchase -- correct.

11   What she wants to do is purchase in Virginia, and she

12   would have to transfer it to a federally an -- if I may

13   say an FFL in --

14          THE COURT:  Please don't do that.  A

15   federally licensed arms dealer in Washington, D.C. would

16   have to receive the gun from a federally licensed arms

17   dealer in Virginia; is that right?

18          MS. WEXLER:  That's correct, Your Honor.

19          THE COURT:  And the argument being advanced

20   is that because at the time the complaint was filed,

21   Ms. Lane contends that there was no licensed federal

22   firearms dealer in Washington, D.C. to receive the weapon

23   she was being derived of her right to buy a gun for self

24   defense.

25          MS. WEXLER:  That's our understanding of what

1   the alleged harm is.

2          THE COURT:  Well, what's the injury here and

3   who caused it, if anyone?

4          MS. WEXLER:  The injury as we understand is

5   being alleged is her inability to obtain a firearm and

6   thereby exercise her Second Amendment right.

7          THE COURT:  Does the Government have to

8   provide guns to people to buy?

9          MS. WEXLER:  No, the Government most

10  certainly doesn't have to.  But, the particular problem

11  that we have identified, the causation problem as Your

12  Honor has indicated is that the United States, the

13  Federal Government is not responsible for the absence of

14  a thriving market for handguns in Washington, D.C. and

15  thereby the lack of firearms dealers through whom she

16  could obtain the gun.

17         THE COURT:  So, there's a right to possess a

18  weapon for self defense, and Ms. Lane contends that she

19  is being deprived of it because there is no market in

20  Washington, at least at the time of her filing where she

21  could lawfully purchase a weapon.

22         MS. WEXLER:  That's correct, Your Honor.

23         THE COURT:  Is that the Government's fault?

24         MS. WEXLER:  That is not the Government's

25  fault.  And that's precisely our argument for why she

1 cannot establish the element of traceability and why

2 there is no subject matter jurisdiction over this case.

3     THE COURT:  All right.  What about the

4 organization?  Does the organization of have standing?

5     MS. WEXLER:  The organization does not have

6 standing, either, Your Honor.  We submit that the Versnel

7 declaration does not satisfy the requirements for

8 organizational standing either insofar as it would try to

9 establish an injury to the organization or an injury to

10 any member.  It's simply too vague.  It's, in fact, less

11 vague than the declaration that was submitted in the

12 *Ezell* case.  It's far more similar to the allegations

13 that were at issue in the *Hodgkins* case which is the

14 precursor of *Dearth*.  That was the name of the case in

15 DDC when the District of Columbia found that SAF did not

16 have standing to challenge the laws there.

17     THE COURT:  All right.  I think I understand

18 your position.

19     Thank you.

20     MS. WEXLER:  Thank you, Your Honor.

21     THE COURT:  Uh-huh.

22     Who's next?

23     MR. CHABALEWSKI:  Good morning, Your Honor.

24 George Chabalewski again for the Superintendent.

25     THE COURT:  Good morning.

1    MR. CHABALEWSKI:  Your Honor, I'm not going

2    to go through our memoranda on all the issues.  I just

3    want to frame some responsive arguments to what was

4    raised by the plaintiff in reply.

5    THE COURT:  All right.

6    MR. CHABALEWSKI:  And principally and the

7    first I think the most important argument is the

8    plaintiff essentially frames this case as a total ban on

9    the purchase of handguns in Virginia as a result of our

10   Virginia statute.  And that is categorically incorrect.

11   There is no ban in Virginia on the purchase of a handgun

12   by a nonresident.

13   All that a resident -- nonresident has to do,

14   however, he can come to Virginia and buy a handgun.  But

15   what Virginia requires is the same thing it requires of

16   its own residents and that is a full, complete assessment

17   of whether that individual in his home state is entitled

18   to have that weapon.

19   We have no ban that essentially prohibits an

20   out-of-state resident from obtaining a handgun.

21   Insofar as the argument for preliminary

22   injunction -- for mandatory preliminary injunction, let

23   me just address the public interest aspect of it.

24   The plaintiffs have said in their reply,

25   quote, "It is unclear what is so compelling about

1    insuring that handgun transfers go through a local

2    middleman who does absolutely nothing that the initial

3    federal firearms licensee does, not other than generate

4    the cost of additional shipping and charge an exorbitant

5    fee".

6              Your Honor, the facts in the record here, the

7    Donna Tate affidavit categorically proves that statement

8    false.  Ms. Tate who is in charge of the State Police's

9    Firearms Center tells you we cannot, as Virginia, do the

10   kind of check that another state can do because we simply

11   don't have access to that information, and that's

12   unrebutted.

13             THE COURT:  Well, Congress has already made a

14   judgment about this law from 1968; is that right?

15             MR. CHABALEWSKI:  As far as the federal law,

16   yes.

17             THE COURT:  Yes, the federal law, 1968.

18   That's when Bob Kennedy was assassinated, Dr. King was

19   murdered.  That's when they decided to regulate handgun

20   purchases from state to state; is that right?

21             MR. CHABALEWSKI:  That is correct.

22             THE COURT:  All right.  Virginia's law does

23   not contain in it the text of a ban on purchasing weapons

24   from out of state residents.

25             MR. CHABALEWSKI:  Correct.

1          THE COURT:  And in this case, if there were a

2   federally licensed firearms dealer in Washington, D.C.,

3   Ms. Lane could get her gun or several guns if she wanted

4   to.

5          MR. CHABALEWSKI:  Correct.

6          THE COURT:  Except, I think, Virginia's idea

7   of gun control is one gun a month.

8          MR. CHABALEWSKI:  Your Honor, that's a

9   different issue for perhaps a different day.

10          THE COURT:  It sure is.  Well, thank you,

11   Mr. Chabalewski.  I think I understand your position.

12          MR. CHABALEWSKI:  Insofar as the four

13   elements, however, for mandatory --

14          THE COURT:  I don't think you understand.  I

15   was trying to let you know that I'm not focused on the

16   injunction just yet.

17          MR. CHABALEWSKI:  Okay.

18          THE COURT:  Plaintiffs cited *Blackwelder*

19   which is no longer the law, so I don't think I need to go

20   there.

21          Thank you.

22          MR. CHABALEWSKI:  Let me then go to, Your

23   Honor, insofar -- well, in which case, I'm going to sit

24   down.

25          THE COURT:  Thank you.

1   MR. CHABALEWSKI:  Thank you, Your Honor.

2   THE COURT:  The judge can be -- you listen.

3   That's a good thing.

4   Come on up, Mr. Koger.

5   MR. KOGER:  Good morning, Your Honor.

6   THE COURT:  Good morning.

7   MR. KOGER:  The District's analysis of the

8   standing barrier to plaintiffs' claims is identical to

9   that of the United States.

10   The inability of Ms. Lane or others to

11   purchase a firearm as residents of the District of

12   Columbia is not a function of District law.  It is a

13   function of the marketplace over which we have no

14   control, but are, in fact, responding to even now, in

15   efforts to make a federally -- a federal firearms

16   licensee available to serve people seeking to acquire

17   handguns in the District.

18   THE COURT:  So what about this argument that

19   the D.C. law is so restrictive on where a firearms dealer

20   can operate that it's in effect a de facto ban?

21   MR. KOGER:  Your Honor, it is not in effect a

22   ban.  We agree that it is -- that it limits the

23   locations.  We believe that as reflected in the

24   declaration submitted last evening that we have a remedy

25   that is specific to this problem which is that the

1   District of Columbia Zoning Commission has provided that

2   a federally licensed firearms dealer or broker may

3   operate an office for the purposes of complying with the

4   District's regulations and federal statutes within either

5   a police or law enforcement building or a licensing

6   agency which in the District of Columbia would likely be

7   the District of Columbia's Department of Consumer and

8   Regulatory Authority.

9           We're trying to accomplish that.  We've

10  also --

11          THE COURT:  So, you're going to have a

12  Government space being made available to a private

13  merchant to sell guns in the police station, and in the

14  D.C. License --

15          MR. KOGER:  DCRA, Your Honor.

16          THE COURT:  DCRA, okay.

17          MR. KOGER:  Likely, Your Honor, only one,

18  given the limited demand, and it would be pursuant to a

19  license which I understand pursuant to a --

20          THE COURT:  To someone who grew up in

21  Southeast, Washington, the idea of going into 14th

22  Precinct to buy a gun seems a little remarkable to me.

23  But, I'm a Virginia judge and whatever the State Council

24  in Washington, D.C. decides to do is fine.

25          I think I understand your position.  The

1   issue of standing as it relate to the organization, do

2   they have standing here?

3                MR. KOGER:  They do not, Your Honor, for the

4   same reasons that the United States very eloquently

5   expressed.

6                The problem is not our laws being a barrier

7   or a prohibition.  The problem is that by nature of the

8   marketplace, whether it be the culture or the history of

9   the District of Columbia, there has not been a thriving

10  market for firearms dealers.

11               Mr. Sykes, I am advised, really is not

12  operating at something akin to a profit if you were to

13  take into account his overhead.  He has been able to have

14  space very cheaply, if not freely for the last few years.

15  That is not now available to him.

16               But for the fact that the District of

17  Columbia has crafted a licensing agreement pursuant to

18  which he would be licensed to use government space for a

19  period of a year for $1,000 for the entire year in order

20  that the Government may facilitate the Second Amendment

21  rights of its residents.

22               THE COURT:  All right.  Thank you very much.

23               Mr. Gura.

24               MR. GURA:  Thank you, Your Honor.  If I may

25  respond briefly to these points.

1          The defendants misconstrue the nature of the
2    complaint and the nature of the allegations that we're
3    making.  We're not complaining about the lack of firearms
4    dealers in Washington, D.C. or the way that the District
5    of Columbia regulates the sale or registration of guns
6    inside the District.
7          Clearly, it is a symptom of the extreme
8    regulations that they have that we have a situation where
9    there are no dealers operating.  But, that's just the
10   worst manifestation of the core injury.  And the core
11   injury that we're claiming here, and it's made very clear
12   in our complaint, and it's the same type of injury that
13   the Seventh Circuit last week understood to exist in the
14   *Ezell* case is this.  People would like to engage in
15   transactions.  Those transactions are handgun
16   transactions outside of the District of Columbia or
17   outside the individual's home state and those
18   transactions are prohibited.
19         So that's the nature of the injury, is that
20   people would like to engage in conduct, that is, people
21   would like to buy a gun.  And they want to buy the gun in
22   Virginia or in some other state in which they do not
23   live.  And that transaction is prohibited by the conduct
24   of the defendants, and that's --
25         THE COURT:  Could you help me with Ms. Lane's

1   standing.  What is her standing here?

2            MR. GURA:  Ms. Lane's standing is that she

3   would like to engage in a handgun transaction with the

4   dealer in Lorton, Virginia, and that transaction is

5   prohibited by all three defendants.

6            That is -- as the Seventh Circuit explained

7   last week in the *Ezell* case, it is not a defense neither

8   on standing or the merits to tell somebody who wants to

9   engage in a constitutionally protected transaction that

10  they can do it somewhere else.  The Supreme Court has

11  historically rejected that.

12           THE COURT:  I don't follow what you're

13  saying, do it somewhere else.

14           My impression is and correct me if I'm wrong.

15  My impression is that since 1968 nonresidents have been

16  able to buy guns out of state.  They just have to buy it

17  through a federally licensed firearms dealer and the

18  state in which they're going to purchase the gun.  And

19  then they have to have it transferred to another

20  federally licensed firearms dealer in the state where

21  they live; is that right?

22           MR. GURA:  That is correct.

23           THE COURT:  And so that is a ban on guns?

24           MR. GURA:  We never said it was a complete

25  ban on guns.  We said it is a complete ban on

1   out-of-state handgun transactions.

2          If you want to have a transaction out of your

3   state -- if I want to go to a store across the state

4   line, take possession of a gun there, I cannot do that.

5   And that is a transaction that people are trying to

6   engage in that's prohibited.

7          THE COURT:  Okay.  So your view of Ms. Lane's

8   injury is that because there is no federally licensed

9   firearms dealer in Washington, D.C., she has been banned

10  from buying a gun out of state?

11         MR. GURA:  That is one manifestation of the

12  injury.  But if we're going to address injury in the

13  strict narrow constitutional sense of what an Article 3

14  injury is, that is, what is the literal thing that a

15  person is barred from doing or a cost is directly imposed

16  by the Government.

17         THE COURT:  So, if a federally licensed

18  firearms dealer existed in Washington, D.C. at the time

19  she sought to buy her gun in Lorton, Virginia, she would

20  not have a claim here; is that right?

21         MR. GURA:  She would.  And that's been our

22  point consistently.  She would -- she -- she always has

23  the claim to engage in a transaction that she's trying to

24  have or that people in the United States would like to be

25  able to buy and sell things where a common market in this

1   country is the genius of the American system that we can

2   cross state lines and buy and sell goods freely.

3              THE COURT:  So, this is a frontal assault on

4   the firearms legislature enacted by Congress in 1968; is

5   that right?  You're asking me to strike it down and to

6   allow residents from any state to buy guns anywhere at

7   any time without there being any regulation of it

8   whatsoever.  Is that right?

9              MR. GURA:  No, no, Your Honor, that is not

10  what we're asking.

11             THE COURT:  Then tell me.  What it is you're

12  asking me to do?

13             MR. GURA:  We're not saying that people

14  should not be allowed to buy guns out of state without

15  regulation at any time.  We readily concede.  We have no

16  problem with the idea --

17             THE COURT:  What is it that you're asking me

18  to do in this case?

19             MR. GURA:  What we're asking you to do is one

20  of two things.  First, people should be able to engage in

21  handgun transactions across state lines the same as they

22  would be able to engage and are, in fact, currently able

23  to engage in rifle and shotgun transactions.

24             That is, people should be able to go to a

25  dealer as long as they comply with the law of their state

1    and the law of the state in which they're in, then the

2    transaction would be approved, which is currently the way

3    business is done.

4              And, even if the Government were to say to

5    us, well, we have these unique handgun specific state

6    disqualifiers that are not in the system, our answer is

7    put them in the system.  Check for them.  Do what you

8    have to do to insure that people are complying with the

9    law.  We have no --

10             THE COURT:  Is this a new argument that

11   you're advancing here?  This is another argument; is it

12   not?

13             MR. GURA:  No.

14             THE COURT:  *Heller* doesn't say that a person

15   as the right to buy a gun, does it?  Does *Heller* say

16   that?

17             MR. GURA:  It actually does.

18             THE COURT:  Does it say that the Government

19   has to supply guns for purchases?

20             MR. GURA:  There's a difference between the

21   right to buy a gun and the right to have a gun supplied.

22             THE COURT:  My question is whether the

23   Government is required to supply guns to citizens.

24             MR. GURA:  The Government is not required to

25   supply guns to citizens.  But the Government is required

1    to respect and not unconstitutionally interfere with

2    citizen's private desires to go out and acquire guns.

3              *Heller* repeatedly cited --

4              THE COURT:  Well, they can buy guns.  You

5    just don't like the way they have to do it.  They can buy

6    guns if they're qualified from state to state.

7              MR. GURA:  And the issue is the

8    constitutionality of the qualifications that are imposed.

9              What the Government is saying, as I

10   understand their position is, they have two arguments.

11   The first argument is we can ban you from having an

12   out-of-state handgun transaction because you can do it in

13   your home state and just take it inside your state --

14   your state's borders.

15             That is not a sufficient constitutional

16   response under -- the way the Supreme Court has handled

17   constitutional rights.  You cannot be told go to some

18   other jurisdiction to do something that is protected.

19             Their second argument is a better argument

20   and this is the one that we take more seriously.  And

21   this is the argument that holds.  We have a very

22   important interest in making sure that people don't

23   violate the handgun laws of their home state.

24             We agree that that is a legitimate Government

25   interest and that is an interest that the Government is

entitled to vindicate through regulation, and there is no
dispute about that.

The only question is whether, in furtherance
of that interest which we readily concede, this type of
law is properly tailored.  And we submit that it is not,
and we have several very obvious facts that would prove
that.

Number one, there is a national instant
background check system --

THE COURT:  Excuse me.  I'm not Congress.
This is federal court.  I'm not Congress.

MR. GURA:  Sure.

THE COURT:  Help me with the issue of
standing for Second Amendment Foundation, Incorporated.

MR. GURA:  Well, this --

THE COURT:  What standing does the
organization have?

MR. GURA:  The organization has standing on
behalf of its members.  This version of standing was
affirmed in *Dearth*.  It was affirmed in *Ezell*.  It was
affirmed in *Wollard*, and it should be affirmed here.

There are three factors that are important
under *Warth v. Seldin*.  First of all, does the
organization have members who are impacted?  Is the
lawsuit germane to the organization's interests?  And is

1   the participation of the individual members necessary for

2   the case to proceed?

3           And all those three factors point to the fact

4   that the Second Amendment Foundation has standing.

5           The interesting thing, though, Your Honor, is

6   that we should not even reach the Second Amendment

7   Foundation standing if the Court is satisfied that there

8   is at least one plaintiff here whose desired transaction

9   is being frustrated.

10           That is a very well-established doctrine.

11   The United States of the Supreme Court a long time ago

12   followed dutifully by the courts that once standing is

13   established for one plaintiff, the standing inquiry

14   ceases.

15           The organization also has standing in its own

16   right as it is in the business of advising people,

17   teaching people and helping people about compliance with

18   the firearms law, and this kind of system clearly imposes

19   a burden on the organization's resources.  And so it also

20   has not just representational standing on behalf of its

21   membership, but also inherent organizational standing as

22   well.

23           But we shouldn't even get that far because

24   it's clear that Ms. Lane and the Wellings have individual

25   standing.  They're trying to engage in a transaction in

1   Virginia which is prohibited.

2           THE COURT:  Well, as I understand it, there

3   was some declaration filed to date that now Mr. Sykes may

4   be able to operate his business in the police station and

5   to receive Ms. Lane's gun.

6           Does that moot the case?

7           MR. GURA:  No, it does not, Your Honor.

8   And I'm happy that we got the D.C. Zoning Board to show

9   up for work last night at 6:15 in the evening.  But it's

10  simply -- and as I've advised the City, and this has

11  always been our position.  If the City wants to moot the

12  case, at least with respect to itself, all it needs to do

13  is say that henceforth we will treat handgun transactions

14  the same way we treat shotgun and rifle transactions.

15  And on this I'd like to address --

16          THE COURT:  I understand your point about

17  that, but you're addressing it to the wrong entity, it

18  seems to me.  You're asking me to change the law, the

19  federal law, about the way handguns are regulated as

20  distinct from rifles and shotguns.

21          And the ultimate threshold you have to cross

22  first with me is the issue of standing.  I'm not even

23  going to talk about citing *Blackwelder* when the new

24  standard is *Winter* and *The Real Truth About Obama*.  So, I

25  don't need to go that far with this.

```
 1              I've asked you the questions I have about
 2   standing.  Would you sum up, please.
 3              MR. GURA:  Our standing position?
 4              THE COURT:  I said I've asked you the
 5   questions I have about standing.  Can you sum up, please.
 6              MR. GURA:  Yes, I would be happy to sum up.
 7   I just would make one point in summation, one and a half
 8   points.
 9              THE COURT:  You can make two if you'd like.
10              MR. GURA:  I'm sorry.
11              THE COURT:  You can make two if you'd like.
12              MR. GURA:  Okay.  We'll see if it amounts to
13   two.  And we do just love the rocket docket, Your Honor.
14              But the Superintendent said that they would
15   be satisfied with -- if someone could show to me full and
16   complete proof that the Zye transaction comports with the
17   law of their home state.
18              That may be more or less challenging in
19   different circumstances, but in this case, it's easy
20   because in order for this to even occur, people must show
21   up with an approved registration certificate from the
22   Metropolitan Police Department in Washington, D.C.
23              Nobody is able to take possession of any kind
24   of firearm, handgun, rifle, or shotgun, if we get our
25   injunction, from a Virginia dealer or any other kind of
```

1   dealers unless they have the pre-approval of the City's

2   police department.

3                So, there's no need to be concerned about

4   whether or not their complying with or evading their home

5   law because that proof is required.

6                And then the other one half point which, I

7   guess, is no more than that, the beauty of the

8   adversarial process is that we are here to point out each

9   other's mistakes.  *Blackwelder* is not the law.  We

10  concede that.  We do not rely on *Blackwelder,* and I

11  apologize if that somehow made it in.  I -- that's all I

12  can say.

13               THE COURT:  They call it practice for a

14  reason, Mr. Gura.

15               MR. GURA:  That's right.

16               THE COURT:  That's fine.  That's fine.

17               MR. GURA:  Thank you.

18               THE COURT:  Thank you.

19               Ms. Wexler, does the Government want to say

20  anything further?

21               MS. WEXLER:  Your Honor, we have nothing

22  further at this time.

23               THE COURT:  Thank you.  Anyone else?

24               All right.  Let the record reflect this

25  matter is before the Court on the plaintiffs' motion for

preliminary injunction, and this is a case involving
Ms. Lane's attempt to purchase a weapon in Virginia for
transfer to her home in Washington, D.C. and a claim
brought by the Second Amendment Foundation, Incorporated.

The issues are whether the Court should grant
Ms. Lane's and Second Amendment Foundation's, Matthew
Welling and Amanda Welling's motion for preliminary
judgment when the plaintiffs allege that the balance of
harm is in plaintiffs' favor because of their inability
to obtain guns in the District of Columbia, and they will
prevail on the merits because they have a constitutional
rights under the Second Amendment to bear arms and the
federal law at issue in this case cannot pass strict
scrutiny and a preliminary injunction would serve the
public interest.

I think this case turns on standing, and I'm
going to deny the preliminary injunction because
plaintiffs lack standing to bring this suit.  They lack
standing because they cannot prove causation and
plaintiffs' injury here, if any is caused by independent
third parties who are not joined in this case and over
whom the Court cannot exercise control.

This case involves two federal laws, 18
United States Code Section 922(b)(3) and 28 -- I'm sorry,
27 CFR 478.99 as well as the District of Columbia

1   Regulations -- Means For Regulation, Title 24 Section

2   2230.3(b)(f) and Virginia Code 18.2-308.2:2.

3              All these regulations and laws deal with the

4   sale of guns and transfer of guns in interstate commerce

5   respective of the states.

6              The plaintiffs are all D.C. residents and

7   apparently Ms. Lane ordered two handguns from a licensed

8   federal firearms dealers in Lorton, Virginia.  And under

9   the law she cannot take possession of the handguns at

10  least at the time of her purchase because the lone D.C.

11  federal firearms licensee, Mr. Charles Sykes closed.  He

12  was out of business at the time.

13             Ms. Amanda Welling and Matthew Welling would

14  like to receive a gun from Texas from Ms. Welling's

15  father but not able to do so because there is no current

16  D.C. federal firearms licensee.  And Second Amendment

17  Foundation is an organization that has members in

18  Virginia and the District of Columbia who allegedly are

19  adversely affected by the federal laws and advocates on

20  behalf of its members.

21             The standard for injunction is well known.

22  And what is sought here is a mandatory affirmative

23  injunction which is an extraordinary remedy.  And

24  granting an injunction in the first instance is an

25  equitable remedy that is an extraordinary remedy.

1    And there are four key points that have to be

2    established under the *Winter versus Natural Resources*

3    *Defense Council*, Supreme Court of United States.

4    First is that the plaintiff is likely to

5    succeed on the merits.  Second, that she is likely to

6    suffered irreparable harm in the absence of preliminary

7    relief.  Third, the balance of equities tips in her

8    favor; and four, an injunction is in the public interest.

9    The Fourth Circuit case is called *The Real*

10   *Truth About Obama* and, the Court has to balance the

11   plaintiff's claim of injury against the effect of

12   granting or withholding the injunction, particularly as

13   to the effect it will have on the public interest.

14   In this case, the plaintiffs cannot show

15   standing or causation.  The complaint here and plaintiffs

16   would have to establish concrete personal injuries which

17   must be fairly traceable to or cause by the defendant's

18   conduct.  And the injury must likely be redressed if

19   relief sought is granted under *Lujan*, that's L-U-J-A-N

20   *versus Defenders of Wildlife*.

21   It's what's called a traceable requirement

22   that insures that it's likely the plaintiff's injury was

23   caused by the challenged conduct of the defendant and not

24   by the independent action of third parties not before the

25   Court, under *The Friends of Farrell Parkway*.  That's

1    F-E-R-R-E-L-L *Parkway versus Stasko*, S-T-A-S-K-O from the

2    Fourth Circuit.

3              And additionally when plaintiff is not the

4    object of the Government action that challenges standing,

5    it's very difficult to establish.  Causation has to turn

6    on the unfettered choices made by independent actors not

7    before the Court and whose control are broad and

8    legitimate discretion the courts cannot presume either to

9    control or predict is generally insufficient.

10             So in this case, what we're talking about is

11   the absence of a licensed federal firearm dealer in the

12   District of Columbia, not an outright ban on purchase of

13   weapons from out-of-state residents, because as counsel

14   acknowledges, it is possible to buy a weapon in another

15   state.  It requires you to purchase the weapon in

16   Virginia from the federally licensed firearms dealer.

17   Then that weapon has to be transferred to a federally

18   licensed firearm dealer in Washington, D.C., go through

19   whatever process the District of Columbia has including

20   ballistic testing before it's actually delivered to the

21   purchaser.

22             So it seems to me what we're talking here is

23   the action of the independent third party.  It's not the

24   federal law that's barring Ms. Lane or Ms. Welling from

25   obtaining a weapon.  It's not the District of Columbia

1   and it's certainly not the Commonwealth of Virginia

2   because our firearms dealer is prepared to make this

3   sale.

4           So in this case, I'm going to deny the motion

5   because plaintiffs are unable to prove the injury is

6   fairly traceable to or caused by the federal firearms

7   laws.

8           I understand the plaintiffs' position that

9   the weapons regulation as it relates to firearms are to

10  be comparable to that of the way transfers of shotguns

11  and rifles is handled by federal law.  But I think that

12  argument belongs before Congress, not before the District

13  Court, specifically the plaintiffs are challenging 18

14  United States Code Section 922(b) which states that,

15  quote, "It shall be unlawful for any licensed importer,

16  licensed manufacturer, licensed dealer or licensed

17  collector to sale or deliver any firearm", end quote.

18          Plaintiffs are not licensed importers,

19  manufacturers, dealers, or collectors.  They are gun

20  purchasers.

21          So, as they are challenging statutes and

22  regulations that do not address their claims, their

23  burden is very high.  And additionally as I've stated

24  earlier, in order to challenge a federal law and to seek

25  a mandatory injunction, a great deal more would have to

1    be shown, and it has not been shown here.

2           So, for those reasons it seems to me that the

3    law does not ban handgun sales in the District of

4    Columbia.  It does not ban handgun sales in Virginia.

5           And the plaintiff acknowledges that the

6    briefs were focused on the old standard for injunction,

7    but I do not have to reach the issue of injunction

8    because in the absence of standing it is not appropriate

9    for me to reach that question in any event.

10          I'm going to deny the District of Columbia's

11   motion to severe because the matter is moot, and the case

12   is now dismissed because plaintiffs lack standing to

13   suit.

14          Thank you.

15          We're in recess.

16          (Proceeding concluded at 11:27 a.m.)

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, Renecia Wilson, an official court

 4   reporter for the United State District Court of Virginia,

 5   Alexandria Division, do hereby certify that I reported by

 6   machine shorthand, in my official capacity, the

 7   proceedings had upon the motions in the case of Michelle

 8   Lane, et al vs. Eric Holder, et al.

 9          I further certify that I was authorized and

10   did report by stenotype the proceedings and evidence in

11   said motions, and that the foregoing pages, numbered 1 to

12   31, inclusive, constitute the official transcript of said

13   proceedings as taken from my shorthand notes.

14          IN WITNESS WHEREOF, I have hereto subscribed

15   my name this 8th day of  August, 2011.

16

17                                /s/
                        Renecia Wilson, RMR, CRR
18                      Official Court Reporter

19

20

21

22

23

24

25
```